# SAN FRANCISCO ARTS & ATHLETICS, INC., ET AL. *v.* UNITED STATES OLYMPIC COMMITTEE ET AL.

No. 86–270.  Argued March 24, 1987—Decided June 25, 1987

POWELL, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, STEVENS, and SCALIA, JJ., joined, and in Parts I, II, and III of which BLACKMUN and O'CONNOR, JJ., joined. O'CONNOR, J., filed an opinion concurring in part and dissenting in part, in which BLACKMUN, J., joined, *post*, p. 548. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 548.

*Mary C. Dunlap* argued the cause for petitioners. With her on the briefs were *Paul Hoffman, Susan McGreivy*, and *Fred Okrand.*

*John G. Kester* argued the cause for respondents. With him on the brief were *Edward Bennett Williams, Vincent J. Fuller, Richard G. Kline, Edward T. Colbert*, and *Joseph D. Lewis.**

JUSTICE POWELL delivered the opinion of the Court.

In this case, we consider the scope and constitutionality of a provision of the Amateur Sports Act of 1978, 36 U. S. C. §§ 371–396, that authorizes the United States Olympic Committee to prohibit certain commercial and promotional uses of the word "Olympic."

---

*\*Robert H. Rotstein, Antonia Hernandez, E. Richard Larson, Abby R. Rubenfeld, Leonard Graff*, and *Armando M. Menocal* filed a brief for the Mexican American Legal Defense and Educational Fund et al. as *amici curiae* urging reversal.

*George Kaufmann* and *Laurence Gold* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance.

*Michael Ratner, Rhonda Copelon, Randall Glenn Wick*, and *Richard A. Perkins* filed a brief for the Amateur Athletic Union of the United States et al. as *amici curiae.*

# I

Petitioner San Francisco Arts & Athletics, Inc. (SFAA), is a nonprofit California corporation.[1] The SFAA originally sought to incorporate under the name "Golden Gate Olympic Association," but was told by the California Department of Corporations that the word "Olympic" could not appear in a corporate title. App. 95. After its incorporation in 1981, the SFAA nevertheless began to promote the "Gay Olympic Games," using those words on its letterheads and mailings and in local newspapers. *Ibid.* The games were to be a 9-day event to begin in August 1982, in San Francisco, California. The SFAA expected athletes from hundreds of cities in this country and from cities all over the world. *Id.*, at 402. The Games were to open with a ceremony "which will rival the traditional Olympic Games." *Id.*, at 354. See *id.*, at 402, 406, 425. A relay of over 2,000 runners would carry a torch from New York City across the country to Kezar Stadium in San Francisco. *Id.*, at 98, 355, 357, 432. The final runner would enter the stadium with the "Gay Olympic Torch" and light the "Gay Olympic Flame." *Id.*, at 357. The ceremony would continue with the athletes marching in uniform into the stadium behind their respective city flags. *Id.*, at 354, 357, 402, 404, 414. Competition was to occur in 18 different contests, with the winners receiving gold, silver, and bronze medals. *Id.*, at 354–355, 359, 407, 410. To cover the cost of the planned Games, the SFAA sold T-shirts, buttons, bumper stickers, and other merchandise bearing the title "Gay Olympic Games." *Id.*, at 67, 94, 107, 113–114, 167, 360, 362, 427–428.[2]

---

[1] The SFAA's president, Dr. Thomas F. Waddell, is also a petitioner.

[2] The 1982 athletic event ultimately was held under the name "Gay Games I." App. 473. A total of 1,300 men and women from 12 countries, 27 States, and 179 cities participated. *Id.*, at 475. The "Gay Games II" were held in 1986 with approximately 3,400 athletes participating from 17 countries. Brief for Respondents 8. The 1990 "Gay Games" are scheduled to occur in Vancouver, B. C. *Ibid.*

Section 110 of the Amateur Sports Act (Act), 92 Stat. 3048, 36 U. S. C. § 380, grants respondent United States Olympic Committee (USOC)[3] the right to prohibit certain commercial and promotional uses of the word "Olympic" and various Olympic symbols.[4]    In late December 1981, the executive

---

[3] The International Olympic Committee is also a respondent.

[4] Section 110 of the Act, as set forth in 36 U. S. C. § 380, provides:

"Without the consent of the [USOC], any person who uses for the purpose of trade, to induce the sale of any goods or services, or to promote any theatrical exhibition, athletic performance, or competition—

"(1) the symbol of the International Olympic Committee, consisting of 5 interlocking rings;

"(2) the emblem of the [USOC], consisting of an escutcheon having a blue chief and vertically extending red and white bars on the base with 5 interlocking rings displayed on the chief;

"(3) any trademark, trade name, sign, symbol, or insignia falsely representing association with, or authorization by, the International Olympic Committee or the [USOC]; or

"(4) the words 'Olympic', 'Olympiad', 'Citius Altius Fortius', or any combination or simulation thereof tending to cause confusion, to cause mistake, to deceive, or to falsely suggest a connection with the [USOC] or any Olympic activity;

"shall be subject to suit in a civil action by the [USOC] for the remedies provided in the Act of July 5, 1946 (60 Stat. 427; popularly known as the Trademark Act of 1946 [Lanham Act]) [15 U. S. C. § 1051 *et seq.*].    However, any person who actually used the emblem in subsection (a)(2) of this section, or the words, or any combination thereof, in subsection (a)(4) of this section for any lawful purpose prior to September 21, 1950, shall not be prohibited by this section from continuing such lawful use for the same purpose and for the same goods or services.    In addition, any person who actually used, or whose assignor actually used, any other trademark, trade name, sign, symbol, or insignia described in subsections (a)(3) and (4) of this section for any lawful purpose prior to September 21, 1950 shall not be prohibited by this section from continuing such lawful use for the same purpose and for the same goods or services.

"(b) The [USOC] may authorize contributors and suppliers of goods or services to use the trade name of the [USOC] as well as any trademark, symbol, insignia, or emblem of the International Olympic Committee or of the [USOC] in advertising that the contributions, goods, or services were donated, supplied, or furnished to or for the use of, approved, selected, or

director of the USOC wrote to the SFAA, informing it of the existence of the Amateur Sports Act, and requesting that the SFAA immediately terminate use of the word "Olympic" in its description of the planned Games. The SFAA at first agreed to substitute the word "Athletic" for the word "Olympic," but, one month later, resumed use of the term. The USOC became aware that the SFAA was still advertising its Games as "Olympic" through a newspaper article in May 1982. In August, the USOC brought suit in the Federal District Court for the Northern District of California to enjoin the SFAA's use of the word "Olympic." The District Court granted a temporary restraining order and then a preliminary injunction. The Court of Appeals for the Ninth Circuit affirmed. After further proceedings, the District Court granted the USOC summary judgment and a permanent injunction.

The Court of Appeals affirmed the judgment of the District Court. 781 F. 2d 733 (1986). It found that the Act granted the USOC exclusive use of the word "Olympic" without requiring the USOC to prove that the unauthorized use was confusing and without regard to the defenses available to an entity sued for a trademark violation under the Lanham Act, 60 Stat. 427, as amended, 15 U. S. C. § 1051 *et seq.* It did not reach the SFAA's contention that the USOC enforced its rights in a discriminatory manner, because the court found that the USOC is not a state actor bound by the constraints of the Constitution. The court also found that the USOC's "property righ[t] [in the word 'Olympic' and its asso-

used by the [USOC] or United States Olympic or Pan-American team or team members.

"(c) The [USOC] shall have exclusive right to use the name 'United States Olympic Committee'; the symbol described in subsection (a)(1) of this section; the emblem described in subsection (a)(2) of this section; and the words 'Olympic', 'Olympiad', 'Citius Altius Fortius' or any combination thereof subject to the preexisting rights described in subsection (a) of this section."

ciated symbols and slogans] can be protected without violating the First Amendment." 781 F. 2d, at 737. The court denied the SFAA's petition for rehearing en banc. Three judges dissented, finding that the panel's interpretation of the Act raised serious First Amendment issues. 789 F. 2d 1319, 1326 (1986).

We granted certiorari, 479 U. S. 913 (1986), to review the issues of statutory and constitutional interpretation decided by the Court of Appeals. We now affirm.

## II

The SFAA contends that the Court of Appeals erred in interpreting the Act as granting the USOC anything more than a normal trademark in the word "Olympic." "[T]he 'starting point in every case involving construction of a statute is the language itself.'" *Kelly* v. *Robinson*, 479 U. S. 36, 43 (1986) (quoting *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 756 (1975) (POWELL, J., concurring)). Section 110 of the Act provides:

> "Without the consent of the [USOC], any person who uses for the purpose of trade, to induce the sale of any goods or services, or to promote any theatrical exhibition, athletic performance, or competition—

> .     .     .     .     .

> "(4) the words 'Olympic', 'Olympiad', 'Citius Altius Fortius', or any combination or simulation thereof tending to cause confusion, to cause mistake, to deceive, or to falsely suggest a connection with the [USOC] or any Olympic activity;

> "shall be subject to suit in a civil action by the [USOC] for the remedies provided in the [Lanham] Act." 36 U. S. C. § 380(a).

The SFAA argues that the clause "tending to cause confusion" is properly read to apply to the word "Olympic." But

because there is no comma after "thereof," the more natural reading of the section is that "tending to cause confusion" modifies only "any combination or simulation thereof." Nevertheless, we do not regard this language as conclusive. We therefore examine the legislative history of this section.

Before Congress passed § 110 of the Act, unauthorized use of the word "Olympic" was punishable criminally. The relevant statute, in force since 1950, did not require the use to be confusing. Instead, it made it a crime for:

> "*any person* . . . other than [the USOC] . . . for the purpose of trade, theatrical exhibition, athletic performance, and competition or as an advertisement to induce the sale of any article whatsoever or attendance at any theatrical exhibition, athletic performance, and competition or for any business or charitable purpose *to use* . . . *the words 'Olympic', 'Olympiad', or 'Citius Altius Fortius' or any combination of these words*." 64 Stat. 901, as amended, 36 U. S. C. § 379 (1976 ed.) (emphasis added).

The House Judiciary Committee drafted the language of § 110 that was ultimately adopted. The Committee explained that the previous "criminal penalty has been found to be unworkable as it requires the proof of a criminal intent." H. R. Rep. No. 95–1627, p. 15 (1978) (House Report). The changes from the criminal statute "were made in response to a letter from the Patent and Trademark Office of the Department of Commerce," *ibid.*, that the Committee appended to the end of its Report. This letter explained:

> "Section 110(a)(4) makes actionable not only use of the words 'Olympic', 'Olympiad', 'Citius Altius Fortius', and any combination thereof, but also any simulation or confusingly similar derivation thereof tending to cause confusion, to cause mistake, to deceive, or to falsely

suggest a connection with the [USOC] or any Olympic activity. . . .

"Section 110 *carries forward some prohibitions from the existing statute enacted in 1950 and adds some new prohibitions, e. g. words described in section (a)(4) tending to cause confusion,* to cause mistake, or to deceive with respect to the [USOC] or any Olympic activity." *Id.,* at 38 (emphasis added).

This legislative history demonstrates that Congress intended to provide the USOC with exclusive control of the use of the word "Olympic" without regard to whether an unauthorized use of the word tends to cause confusion.

The SFAA further argues that the reference in § 110 to Lanham Act *remedies* should be read as incorporating the traditional trademark *defenses* as well. See 15 U. S. C. § 1115(b).[5] This argument ignores the clear language of the section. Also, this shorthand reference to remedies replaced an earlier draft's specific list of remedies typically available for trademark infringement, *e. g.,* injunctive relief, recovery of profits, damages, costs, and attorney's fees. See Lanham Act §§ 34, 35, 15 U. S. C. §§ 1116, 1117. This list contained no reference to trademark defenses. 124 Cong. Rec. 12865, 12866 (1978) (proposed § 110(c)). Moreover, the USOC already held a trademark in the word "Olympic." App. 378–382. Under the SFAA's interpretation, the Act would be largely superfluous. In sum, the language and legislative history of § 110 indicate clearly that Congress intended to grant the USOC exclusive use of the word "Olympic" without regard to whether use of the word tends to cause confusion, and that § 110 does not incorporate defenses available under the Lanham Act.

---

[5] Specifically, the SFAA argues that the USOC should not be able to prohibit its use of the word "Olympic" because its use "is descriptive of and used fairly and in good faith only to describe to users the goods or services." 15 U. S. C. § 1115(b)(4).

## III

This Court has recognized that "[n]ational protection of trademarks is desirable . . . because trademarks foster competition and the maintenance of quality by securing to the producer the benefits of good reputation." *Park 'N Fly, Inc.* v. *Dollar Park and Fly, Inc.*, 469 U. S. 189, 198 (1985). In the Lanham Act, 15 U. S. C. § 1051 *et seq.*, Congress established a system for protecting such trademarks. Section 45 of the Lanham Act defines a trademark as "any word, name, symbol, or device or any combination thereof adopted and used by a manufacturer or merchant to identify and distinguish his goods, including a unique product, from those manufactured or sold by others." 15 U. S. C. § 1127 (1982 ed., Supp. III). Under § 32 of the Lanham Act, the owner of a trademark is protected from unauthorized uses that are "likely to cause confusion, or to cause mistake, or to deceive." § 1114(1)(a). Section 33 of the Lanham Act grants several statutory defenses to an alleged trademark infringer. § 1115.

The protection granted to the USOC's use of the Olympic words and symbols differs from the normal trademark protection in two respects: the USOC need not prove that a contested use is likely to cause confusion, and an unauthorized user of the word does not have available the normal statutory defenses.[6] The SFAA argues, in effect, that the differences between the Lanham Act and § 110 are of constitutional dimension. First, the SFAA contends that the word "Olympic" is a generic[7] word that could not gain trademark protection under the Lanham Act. The SFAA argues that this

---

[6] The user may, however, raise traditional equitable defenses, such as laches. See Brief for Respondents 20, n. 17.

[7] A common descriptive name of a product or service is generic. Because a generic name by definition does not *distinguish* the identity of a particular product, it cannot be registered as a trademark under the Lanham Act. See §§ 2, 14(c), 15 U. S. C. §§ 1052, 1064(c). See also 1 J. McCarthy, Trademarks and Unfair Competition § 12:1, p. 520 (1984).

prohibition is constitutionally required and thus that the First Amendment prohibits Congress from granting a trademark in the word "Olympic." Second, the SFAA argues that the First Amendment prohibits Congress from granting exclusive use of a word absent a requirement that the authorized user prove that an unauthorized use is likely to cause confusion. We address these contentions in turn.

## A

This Court has recognized that words are not always fungible, and that the suppression of particular words "run[s] a substantial risk of suppressing ideas in the process." *Cohen* v. *California*, 403 U. S. 15, 26 (1971). The SFAA argues that this principle prohibits Congress from granting the USOC exclusive control of uses of the word "Olympic," a word that the SFAA views as generic.[8] Yet this recognition always has been balanced against the principle that when a word acquires value "as the result of organization and the expenditure of labor, skill, and money" by an entity, that entity constitutionally may obtain a limited property right in the word. *International News Service* v. *Associated Press*, 248 U. S. 215, 239 (1918). See *Trade-Mark Cases*, 100 U. S. 82, 92 (1879).

There is no need in this case to decide whether Congress ever could grant a private entity exclusive use of a generic word. Congress reasonably could conclude that the com-

---

[8] This grant by statute of exclusive use of distinctive words and symbols by Congress is not unique. Violation of some of these statutes may result in criminal penalties. See, *e. g.*, 18 U. S. C. § 705 (veterans' organizations); § 706 (American National Red Cross); § 707 (4–H Club); § 711 ("Smokey Bear"); § 711a ("Woodsy Owl"). See also *FTC* v. *A. P. W. Paper Co.*, 328 U. S. 193 (1946) (reviewing application of Red Cross statute). Others, like the USOC statute, provide for civil enforcement. See, *e. g.*, 36 U. S. C. § 18c (Daughters of the American Revolution); § 27 (Boy Scouts); § 36 (Girl Scouts); § 1086 (Little League Baseball); § 3305 (1982 ed., Supp. III) (American National Theater and Academy).

mercial and promotional value of the word "Olympic" was the product of the USOC's "own talents and energy, the end result of much time, effort, and expense." *Zacchini* v. *Scripps-Howard Broadcasting Co.*, 433 U. S. 562, 575 (1977). The USOC, together with respondent International Olympic Committee (IOC), have used the word "Olympic" at least since 1896, when the modern Olympic Games began. App. 348. Baron Pierre de Coubertin of France, acting pursuant to a government commission, then proposed the revival of the ancient Olympic Games to promote international understanding. D. Chester, The Olympic Games Handbook 13 (1975). De Coubertin sought to identify the "spirit" of the ancient Olympic Games that had been corrupted by the influence of money and politics. See M. Finley & H. Pleket, The Olympic Games: The First Thousand Years 4 (1976).[9] De Coubertin thus formed the IOC, that has established elaborate rules and procedures for the conduct of the modern Olympics. See Olympic Charter, Rules 26–69 (1985). In addition, these rules direct every national committee to protect the use of the Olympic flag, symbol, flame, and motto from unauthoruse. *Id.*, Bye-laws to Rules 6 and 53.[10] Under the IOC

---

[9] The ancient Olympic Games were held from 776 B.C. until A.D. 393, when they were abolished by the Roman Emperor Theodosius I. The Olympic Games were the most important in a "circuit" of sporting festivals. The "circuit" also included the Pythian Games at Delphi, the Nemean Games at Nemea, and the Isthmian Games at Corinth. As these sporting festivals grew in importance, athletes turned from amateurs to true professionals, training all year and receiving substantial gifts and money from individuals and from their home cities. See M. Finley & H. Pleket, The Olympic Games: The First Thousand Years 68–82 (1976); 25 Encyc. Brit. 198 (15th ed. 1984).

[10] The Olympic flag was presented by Baron De Coubertin at the Congress of Paris in 1914. It has a white background with five interlocking rings in the center. The rings, in the colors blue, yellow, black, green, and red, in that order, "symbolize the union of the five continents and the meeting of athletes from all over the world at the Olympic Games in a spirit of fair and frank competition and good friendship, the ideal preached by Baron de Coubertin." Olympic Charter, Rule 6 (1985). The Olympic

Charter, the USOC is the national olympic committee for the United States with the sole authority to represent the United States at the Olympic Games.[11] Pursuant to this authority, the USOC has used the Olympic words and symbols extensively in this country to fulfill its object under the Olympic Charter of "ensur[ing] the development and safeguarding of the Olympic Movement and sport." *Id.*, Rule 24.

The history of the origins and associations of the word "Olympic" demonstrates the meritlessness of the SFAA's contention that Congress simply plucked a generic word out of the English vocabulary and granted its exclusive use to the USOC. Congress reasonably could find that since 1896, the word "Olympic" has acquired what in trademark law is known as a secondary meaning—it "has become distinctive of [the USOC's] goods in commerce." Lanham Act, § 2(f), 15 U. S. C. § 1052(f). See *Park 'N Fly, Inc.* v. *Dollar Park and Fly, Inc.*, 469 U. S., at 194. The right to adopt and use such a word "to distinguish the goods or property [of] the person whose mark it is, to the exclusion of use by all other persons, has been long recognized." *Trade-Mark Cases, supra*, at 92. Because Congress reasonably could conclude that the USOC has distinguished the word "Olympic" through its own efforts, Congress' decision to grant the USOC a limited property right in the word "Olympic" falls

---

rings alone are the Olympic symbol. *Ibid.* The Olympic flame is formally lit in Olympia under the auspices of the IOC. The Olympic motto is "Citius, Altius, Fortius," meaning "Faster, Higher, Stronger," and "expresses the aspirations of the Olympic Movement." *Ibid.* The motto originated at an international conference on the principles of amateurism in sports organized by De Coubertin and held in 1894 at the Sorbonne in Paris. A French delegate, Père Henri-Martin Didon suggested as a motto the words engraved on the entrance to his lycée (school), Albert le Grand. Shortly thereafter, De Coubertin founded the IOC, which adopted this motto. A. Guttmann, The Games Must Go On 13–14 (1984).

[11] The USOC was formally organized in 1921, replacing the more informally organized American Olympic Committee. The USOC received its first corporate charter in 1950.

within the scope of trademark law protections, and thus certainly within constitutional bounds.

## B

Congress also acted reasonably when it concluded that the USOC should not be required to prove that an unauthorized use of the word "Olympic" is likely to confuse the public.[12] To the extent that § 110 applies to uses "for the purpose of trade [or] to induce the sale of any goods or services," 36 U. S. C. § 380(a), its application is to commercial speech. Commercial speech "receives a limited form of First Amendment protection." *Posadas de Puerto Rico Assoc.* v. *Tourism Company of Puerto Rico,* 478 U. S. 328, 340 (1986); *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York,* 447 U. S. 557, 562–563 (1980). Section 110 also allows the USOC to prohibit the use of "Olympic" for promotion of theatrical and athletic events. Although many of these promotional uses will be commercial speech, some uses may go beyond the "strictly business" context. See *Friedman* v. *Rogers,* 440 U. S. 1, 11 (1979). In this case, the SFAA claims that its use of the word "Olympic" was intended to convey a political statement about the status of homosexuals in society.[13] Thus, the SFAA claims that in this case § 110 suppresses political speech.

---

[12] To the extent that § 110 regulates confusing uses, it is within normal trademark bounds. The Government constitutionally may regulate "deceptive or misleading" commercial speech. *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council, Inc.,* 425 U. S. 748, 771 (1976); *Friedman* v. *Rogers,* 440 U. S. 1, 9–10 (1979).

[13] According to the SFAA's president, the Gay Olympic Games would have offered three "very important opportunities":

"1) To provide a healthy recreational alternative to a suppressed minority.

"2) To educate the public at large towards a more reasonable characterization of gay men and women.

"3) To attempt, through athletics, to bring about a positive and gradual assimilation of gay men and women, as well as gays and non-gays, and to

By prohibiting the use of one word for particular purposes, neither Congress nor the USOC has prohibited the SFAA from conveying its message. The SFAA held its athletic event in its planned format under the names "Gay Games I" and "Gay Games II" in 1982 and 1986, respectively. See n. 2, *supra*. Nor is it clear that § 110 restricts purely expressive uses of the word "Olympic."[14] Section 110 restricts only the manner in which the SFAA may convey its message. The restrictions on expressive speech properly are characterized as incidental to the primary congressional purpose of encouraging and rewarding the USOC's activities.[15] The ap-

---

diminish the ageist, sexist and racist divisiveness existing in all communities regardless of sexual orientation." App. 93.

His expectations "were that people of all persuasions would be drawn to the event because of its Olympic format and that its nature of 'serious fun' would create a climate of friendship and co-operation[;] false images and misconceptions about gay people would decline as a result of a participatory *[sic]* educational process, and benefit ALL communities." *Id.*, at 93–94. He thought "[t]he term 'Olympic' best describe[d] [the SFAA's] undertaking" because it embodied the concepts of "peace, friendship and positive social interaction." *Id.*, at 99.

[14] One court has found that § 110 does not prohibit the use of the Olympic logo of five interlocking rings and the Olympic torch on a poster expressing opposition to the planned conversion of the Olympic Village at Lake Placid, New York, into a prison. The court found that the use of the symbols did not fit the commercial or promotional definition of uses in § 110. *Stop the Olympic Prison* v. *United States Olympic Committee*, 489 F. Supp. 1112, 1118–1121 (SDNY 1980).

[15] JUSTICE BRENNAN finds the Act unconstitutionally overbroad. But on its face, it applies primarily to commercial speech, to which the application of the overbreadth doctrine is highly questionable. See *Ohralik* v. *Ohio State Bar Assn.*, 436 U. S. 447, 462, n. 20 (1978) (citing *Bates* v. *State Bar of Arizona*, 433 U. S. 350, 380 (1977)). There is no basis in the record to believe that the Act will be interpreted or applied to infringe significantly on noncommercial speech rights. The application of the Act to the SFAA is well within constitutional bounds, and the extent to which the Act may be read to apply to noncommercial speech is limited. We find no "realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 801

propriate inquiry is thus whether the incidental restrictions on First Amendment freedoms are greater than necessary to further a substantial governmental interest. *United States v. O'Brien*, 391 U. S. 367, 377 (1968).[16]

One reason for Congress to grant the USOC exclusive control of the word "Olympic," as with other trademarks, is to ensure that the USOC receives the benefit of its own efforts so that the USOC will have an incentive to continue to produce a "quality product," that, in turn, benefits the public. See 1 J. McCarthy, Trademarks and Unfair Competition § 2:1, pp. 44–47 (1984). But in the special circumstance of the USOC, Congress has a broader public interest in promoting, through the activities of the USOC, the participation of amateur athletes from the United States in "the great four-yearly sport festival, the Olympic Games." Olympic Charter, Rule 1 (1985). The USOC's goal under the Olympic Charter, Rule 24(B), is to further the Olympic movement, that has as its aims: "to promote the development of those physical and moral qualities which are the basis of sport"; "to educate young people through sport in a spirit of better understanding between each other and of friendship, thereby helping to build a better and more peaceful world"; and "to spread the Olympic principles throughout the world, thereby creating international goodwill." *Id.*, Rule 1. See also *id.*, Rule 11 (aims of the IOC). Congress' interests in promoting the USOC's activities include these purposes as well as those

---

(1984). Accordingly, we decline to apply the overbreadth doctrine to this case.

[16] A restriction on nonmisleading commercial speech may be justified if the government's interest in the restriction is substantial, directly advances the government's asserted interest, and is no more extensive than necessary to serve the interest. *Central Hudson Gas & Electric Corp.* v. *Public Service Comm'n of New York*, 447 U. S. 557, 566 (1980). Both this test and the test for a time, place, or manner restriction under *O'Brien* require a balance between the governmental interest and the magnitude of the speech restriction. Because their application to these facts is substantially similar, they will be discussed together.

specifically enumerated in the USOC's charter.[17]    Section
110 directly advances these governmental interests by sup-
plying the USOC with the means to raise money to support

---

[17] The objects and purposes of the USOC are to:

"(1) establish national goals for amateur athletic activities and encour-
age the attainment of those goals;

"(2) coordinate and develop amateur athletic activity in the United
States directly relating to international amateur athletic competition,
so as to foster productive working relationships among sports-related
organizations;

"(3) exercise exclusive jurisdiction, either directly or through its constit-
uent members of committees, over matters pertaining to the participation
of the United States in the Olympic Games and the Pan-American Games,
including the representation of the United States in such games, and over
the organization of the Olympic Games and the Pan-American Games when
held in the United States;

"(4) obtain for the United States, either directly or by delegation to the
appropriate national governing body, the most competent amateur repre-
sentation possible in each competition and event of the Olympic Games and
of the Pan-American Games;

"(5) promote and support amateur athletic activities involving the
United States and foreign nations;

"(6) promote and encourage physical fitness and public participation in
amateur athletic activities;

"(7) assist organizations and persons concerned with sports in the devel-
opment of amateur athletic programs for amateur athletes;

"(8) provide for the swift resolution of conflicts and disputes involving
amateur athletes, national governing bodies, and amateur sports organiza-
tions, and protect the opportunity of any amateur athlete, coach, trainer,
manager, administrator, or official to participate in amateur athletic
competition;

"(9) foster the development of amateur athletic facilities for use by
amateur athletes and assist in making existing amateur athletic facilities
available for use by amateur athletes;

"(10) provide and coordinate technical information on physical training,
equipment design, coaching, and performance analysis;

"(11) encourage and support research, development, and dissemination
of information in the areas of sports medicine and sports safety;

"(12) encourage and provide assistance to amateur athletic activities for
women;

"(13) encourage and provide assistance to amateur athletic programs
and competition for handicapped individuals, including, where feasible, the

the Olympics and encourages the USOC's activities by ensuring that it will receive the benefits of its efforts.

The restrictions of § 110 are not broader than Congress reasonably could have determined to be necessary to further these interests. Section 110 primarily applies to all uses of the word "Olympic" to induce the sale of goods or services. Although the Lanham Act protects only against confusing uses, Congress' judgment respecting a certain word is not so limited. Congress reasonably could conclude that most commercial uses of the Olympic words and symbols are likely to be confusing. It also could determine that unauthorized uses, even if not confusing, nevertheless may harm the USOC by lessening the distinctiveness and thus the commercial value of the marks. See Schechter, The Rational Basis of Trademark Protection, 40 Harv. L. Rev. 813, 825 (1927) (one injury to a trademark owner may be "the gradual whittling away or dispersion of the identity and hold upon the public mind of the mark or name" by nonconfusing uses).

In this case, the SFAA sought to sell T-shirts, buttons, bumper stickers, and other items, all emblazoned with the title "Gay Olympic Games." The possibility for confusion as to sponsorship is obvious. Moreover, it is clear that the SFAA sought to exploit the "commercial magnetism," see *Mishawaka Rubber & Woolen Mfg. Co.* v. *S. S. Kresge Co.*, 316 U. S. 203, 205 (1942), of the word given value by the USOC. There is no question that this unauthorized use could undercut the USOC's efforts to use, and sell the right to use, the word in the future, since much of the word's value comes from its limited use. Such an adverse effect on the USOC's activities is directly contrary to Congress' interest.

---

expansion of opportunities for meaningful participation by handicapped individuals in programs of athletic competition for able-bodied individuals; and

"(14) encourage and provide assistance to amateur athletes of racial and ethnic minorities for the purpose of eliciting the participation of such minorities in amateur athletic activities in which they are underrepresented." 36 U. S. C. § 374.

Even though this protection may exceed the traditional rights of a trademark owner in certain circumstances, the application of the Act to this commercial speech is not broader than necessary to protect the legitimate congressional interest and therefore does not violate the First Amendment.

Section 110 also extends to promotional uses of the word "Olympic," even if the promotion is not to induce the sale of goods. Under § 110, the USOC may prohibit purely promotional uses of the word only when the promotion relates to an athletic or theatrical event. The USOC created the value of the word by using it in connection with an athletic event. Congress reasonably could find that use of the word by other entities to promote an athletic event would directly impinge on the USOC's legitimate right of exclusive use. The SFAA's proposed use of the word is an excellent example. The "Gay Olympic Games" were to take place over a 9-day period and were to be held in different locations around the world. They were to include a torch relay, a parade with uniformed athletes of both sexes divided by city, an "Olympic anthem" and "Olympic Committee," and the award of gold, silver, and bronze medals, and were advertised under a logo of three overlapping rings. All of these features directly parallel the modern-day Olympics, not the Olympic Games that occurred in ancient Greece.[18] The image the SFAA

---

[18] The ancient Olympic Games lasted 5 days, whereas the modern Olympics last for 10 days. The ancient Games always took place in Olympia in southern Greece; the modern Olympic Games normally move from city to city every four years. (As an effort to reduce nationalism, cities, as opposed to countries, host the modern Olympic Games.) In ancient Greece there may have been a burning fire for religious sacrifice, since the Olympic Games were part of a religious festival. See The Odes of Pindar, Olympia 8, ll. 1–9, p. 25 (R. Lattimore transl., 2d ed. 1976). The torch relay, however, was an innovation of the modern Olympic Committee. The closest parallel to the modern opening parade was the opening of the ancient Games with the chariot race. As the chariots entered the arena and passed the judges, a herald called out the names of the owner, his father,

sought to invoke was exactly the image carefully cultivated by the USOC. The SFAA's expressive use of the word cannot be divorced from the value the USOC's efforts have given to it. The mere fact that the SFAA claims an expressive, as opposed to a purely commercial, purpose does not give it a First Amendment right to "appropriat[e] to itself the harvest of those who have sown." *International News Service* v. *Associated Press*, 248 U. S., at 239–240.[19] The USOC's right to prohibit use of the word "Olympic" in the promotion of athletic events is at the core of its legitimate property right.[20]

---

and his city. See Finley & Pleket, *supra* n. 9, at 27. There was no general parade of athletes by locality, as in the modern Games, and the athletes were naked, not uniformed. Athletes were eligible only if they were male, freeborn Greeks. There is no indication that the ancient Olympics included an "Olympic anthem" or were organized by an entity called an "Olympic Committee." The awards in ancient Greece were wreaths of wild olive, rather than the gold, silver, and bronze medals presented at the modern Olympics. The logo of overlapping rings was created by the International Olympic Committee. See n. 10, *supra*. See generally The Olympics: A Book of Lists 10–13 (J. Beilenson & N. Beilenson eds. 1984); Finley & Pleket, *supra* n. 8; 25 Encyc. Brit. 197–201 (15th ed. 1984).

[19] The SFAA claims a superior right to the use of the word "Olympic" because it is a nonprofit corporation and its athletic event was not organized for the primary purpose of commercial gain. But when the question is the scope of a legitimate property right in a word, the SFAA's distinction is inapposite. As this Court has noted in the analogous context of "fair use" under the Copyright Act:

"The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the [protected] material without paying the customary price." *Harper & Row Publishers, Inc.* v. *Nation Enterprises*, 471 U. S. 539, 562 (1985).

Here, the SFAA's proposed use of the word "Olympic" was a clear attempt to exploit the imagery and goodwill created by the USOC.

[20] Although a theatrical production is not as closely related to the primary use of the word by the USOC as is an athletic event, Congress reasonably could have found that when the word "Olympic" is used to promote such a production, it would implicate the value given to the word by the USOC.

## IV

The SFAA argues that even if the exclusive use granted by § 110 does not violate the First Amendment, the USOC's enforcement of that right is discriminatory in violation of the Fifth Amendment.[21] The fundamental inquiry is whether the USOC is a governmental actor to whom the prohibitions of the Constitution apply.[22] The USOC is a "private cor-

---

[21] The SFAA invokes the Fourteenth Amendment for its discriminatory enforcement claim. The Fourteenth Amendment applies to actions by a State. The claimed association in this case is between the USOC and the Federal Government. Therefore, the Fourteenth Amendment does not apply. The Fifth Amendment, however, does apply to the Federal Government and contains an equal protection component. *Bolling* v. *Sharpe*, 347 U. S. 497, 499 (1954). "This Court's approach to Fifth Amendment equal protection claims has . . . been precisely the same as to equal protection claims under the Fourteenth Amendment." *Weinberger* v. *Wiesenfeld*, 420 U. S. 636, 638, n. 2 (1975). See *Buckley* v. *Valeo*, 424 U. S. 1 (1976) *(per curiam)*. Petitioners raised the issue of discriminatory enforcement in their petition for certiorari, and both petitioners and respondents have briefed the issue fully. Accordingly, we address the claim as one under the Fifth Amendment.

[22] Because we find no governmental action, we need not address the merits of the SFAA's discriminatory enforcement claim. We note, however, that the SFAA's claim of discriminatory enforcement is far from compelling. As of 1982 when this suit began, the USOC had brought 22 oppositions to trademark applications and one petition to cancel. App. 61. For example, the USOC successfully prohibited registration of the mark "Golden Age Olympics." *Id.*, at 383. The USOC also litigated numerous suits prior to bringing this action, prohibiting use of the Olympic words and symbols by such entities as the National Amateur Sports Foundation, *id.*, at 392, a shoe company, *id.*, at 395, the International Federation of Body Builders, *id.*, at 443, and a bus company, *id.*, at 439. Since 1982, the USOC has brought a number of additional suits against various companies and the March of Dimes Birth Defects Foundation, *id.*, at 437, and Brief for Respondents 41, n. 58. The USOC has authorized the use of the word "Olympic" to organizations that sponsor athletic competitions and events for handicapped persons ("Special Olympics") and for youth ("Junior Olympics" and "Explorer Olympics"). App. 33, 181. Both of these uses directly relate to a purpose of the USOC established by its charter. See 36 U. S. C. §§ 374(7), (13), reprinted *supra*, at 538–539, n. 17. The USOC

poratio[n] established under Federal law." 36 U. S. C. § 1101(46).[23] In the Act, Congress granted the USOC a corporate charter, § 371, imposed certain requirements on the USOC,[24] and provided for some USOC funding through exclusive use of the Olympic words and symbols, § 380, and through direct grants.[25]

The fact that Congress granted it a corporate charter does not render the USOC a Government agent. All corporations

---

has not consented to any other uses of the word in connection with athletic competitions or events. App. 33.

The USOC necessarily has discretion as to when and against whom it files opposition to trademark applications, and when and against whom it institutes suits. The record before us strongly indicates that the USOC has acted strictly in accord with its charter and that there has been no actionable discrimination.

[23] As such, the USOC is listed with 69 other federally created private corporations such as the American Legion, Big Brothers—Big Sisters of America, Daughters of the American Revolution, Veterans of Foreign Wars of the United States, the National Academy of Sciences, and the National Ski Patrol System, Inc. 36 U. S. C. § 1101. It hardly need be said that if federally created private corporations were to be viewed as governmental rather than private actors, the consequences would be far reaching. Apart from subjecting these private entities to suits under the equal protection component of the Due Process Clause of the Fifth Amendment, presumably—by analogy—similar types of nonprofit corporations established under state law could be viewed as governmental actors subject to such suits under the Equal Protection Clause of the Fourteenth Amendment.

[24] For example, the USOC may amend its constitution only after providing an opportunity for notice and hearing, § 375(b); the USOC must allow for reasonable representation in its membership of certain groups, § 376(b); the USOC must remain nonpolitical, § 377; and the USOC must report on its operations and expenditures of grant moneys to Congress each year, § 382a.

[25] The USOC may apply to the Secretary of Commerce for yearly grants not to exceed a total of $16 million, § 384(a), but it has never done so. See Brief for Respondents 46. The only direct federal funding that the USOC has received is a $10 million grant in 1980, characterized by Congress as "a form of disaster payment" to help the USOC recover from the losses resulting from the boycott of the Moscow Olympics. See S. Rep. No. 96–829, p. 241 (1980); Act of July 8, 1980, 94 Stat. 857, 898.

act under charters granted by a government, usually by a State. They do not thereby lose their essentially private character. Even extensive regulation by the government does not transform the actions of the regulated entity into those of the government. See *Jackson* v. *Metropolitan Edison Co.*, 419 U. S. 345 (1974). Nor is the fact that Congress has granted the USOC exclusive use of the word "Olympic" dispositive. All enforceable rights in trademarks are created by some governmental act, usually pursuant to a statute or the common law. The actions of the trademark owners nevertheless remain private. Moreover, the intent on the part of Congress to help the USOC obtain funding does not change the analysis. The Government may subsidize private entities without assuming constitutional responsibility for their actions. *Blum* v. *Yaretsky*, 457 U. S. 991, 1011 (1982); *Rendell-Baker* v. *Kohn*, 457 U. S. 830, 840 (1982).

This Court also has found action to be governmental action when the challenged entity performs functions that have been "'traditionally the *exclusive* prerogative'" of the Federal Government. *Id.*, at 842 (quoting *Jackson* v. *Metropolitan Edison Co.*, *supra*, at 353; quoted in *Blum* v. *Yaretsky*, *supra*, at 1011) (emphasis added by the *Rendell-Baker* Court). Certainly the activities performed by the USOC serve a national interest, as its objects and purposes of incorporation indicate. See n. 17, *supra*. The fact "[t]hat a private entity performs a function which serves the public does not make its acts [governmental] action." *Rendell-Baker* v. *Kohn*, *supra*, at 842. The Amateur Sports Act was enacted "to correct the disorganization and the serious factional disputes that seemed to plague amateur sports in the United States." House Report, at 8. See *Oldfield* v. *Athletic Congress*, 779 F. 2d 505 (CA9 1985) (citing S. Rep. No. 95–770, pp. 2–3 (1978)). The Act merely authorized the

USOC to coordinate activities that always have been performed by private entities.[26] Neither the conduct nor the coordination of amateur sports has been a traditional governmental function.[27]

---

[26] The Commission that recommended the current USOC powers "made it clear that it did not want the Federal Government directing amateur athletics in this country." House Report, at 9.

[27] The dissent does not rely on the fact that the USOC is chartered by Congress to find governmental action in this case. *Post*, at 548–560. JUSTICE BRENNAN attempts to distinguish the USOC from other private corporations that are chartered by Congress on the ground that the USOC performs the "distinctive, traditional governmental function" of "represent[ing] this Nation to the world community." *Post*, at 550. But absent the additional element of governmental control, this representational function can hardly be called traditionally governmental. All sorts of private organizations send "national representatives" to participate in world competitions. Although many are of interest only to a select group, others, like the Davis Cup Competition, the America's Cup, and the Miss Universe Pageant, are widely viewed as involving representation of our country. The organizations that sponsor United States participation in these events all perform "national . . . representational" as well as "administrative [and] adjudicative role[s]," see *post*, at 555, in selecting and presenting the national representatives.

As with the corporate charter, the dissent acknowledges that the representational role of the USOC is not dispositive. *Post*, at 553. According to the dissent, the Olympic Games are "unique [because] at stake are significant national interests that stem not only from pageantry but from politics." *Post*, at 551. The dissent then relies primarily on the sequence of events preceding the USOC's decision not to send athletes to the 1980 summer Olympics as demonstrating "the impact and interrelationship of USOC decisions on the definition and pursuit of the national interest." *Post*, at 553. But the governmental influence on that particular decision of the USOC is hardly representative in view of the absence of such influence on the vast majority of USOC decisions. Moreover, even the unique sequence of events in 1980 confirms that the USOC cannot properly be considered a governmental agency. Although the President and Congress indicated their view that United States athletes should not go to the Moscow Olympics, this was not the end of the matter. The President thought it would be necessary to take "legal actions [if] necessary" to prevent the USOC from sending a team to Moscow. See 1 Public Papers of the Presi-

Most fundamentally, this Court has held that a government "normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [government]." *Blum* v. *Yaretsky, supra,* at 1004; *Rendell-Baker* v. *Kohn, supra,* at 840. See *Flagg Bros., Inc.* v. *Brooks,* 436 U. S. 149, 166 (1978); *Jackson* v. *Metropolitan Edison Co., supra,* at 357; *Moose Lodge No. 107* v. *Irvis,* 407 U. S. 163, 173 (1972); *Adickes* v. *S. H. Kress & Co.,* 398 U. S. 144,

---

dents, Jimmy Carter 1980–1981, p. 636 (1981). Previously, the Attorney General had indicated that the President believed that he had the power under the Emergency Powers Act, 50 U. S. C. § 1701, to bar travel to an area that he considered to pose a threat of national emergency. See Washington Post, Apr. 11, 1980, p. A1. The President's statement indicated a clear recognition that neither he nor Congress could control the USOC's actions directly. A District Court, confronted with the question whether the decision not to send athletes to the 1980 Olympics was state action, noted:

"The USOC is an independent body, and nothing in its chartering statute gives the federal government the right to control that body or its officers. Furthermore, the facts here do not indicate that the federal government was able to exercise any type of '*de facto*' control over the USOC. The USOC decided by a secret ballot of its House of Delegates. The federal government may have had the power to prevent the athletes from participating in the Olympics even if the USOC had voted to allow them to participate, but it did not have the power to make them vote in a certain way. All it had was the power of persuasion. We cannot equate this with control. To do so in cases of this type would be to open the door and usher the courts into what we believe is a largely nonjusticiable realm, where they would find themselves in the untenable position of determining whether a certain level, intensity, or type of 'Presidential' or 'Administrative' or 'political' pressure amounts to sufficient control over a private entity so as to invoke federal jurisdiction." *DeFrantz* v. *United States Olympic Committee,* 492 F. Supp. 1181, 1194 (DC), aff'd mem., 226 U. S. App. D. C. 210, 701 F. 2d 221 (1980).

In sum, we remain unconvinced that the functions that the USOC performs can be viewed as "governmental" action.

170 (1970). The USOC's choice of how to enforce its exclusive right to use the word "Olympic" simply is not a governmental decision.[28]  There is no evidence that the Federal Government coerced or encouraged the USOC in the exercise of its right. At most, the Federal Government, by failing to supervise the USOC's use of its rights, can be said to exercise "[m]ere approval of or acquiescence in the initiatives" of the USOC. *Blum* v. *Yaretsky*, 457 U. S., at 1004–1005. This is not enough to make the USOC's actions those of the Government. *Ibid.*  See *Flagg Bros., Inc.* v. *Brooks, supra,* at 164–165; *Jackson* v. *Metropolitan Edison Co.*, 419 U. S., at 357.[29]  Because the USOC is not a governmental actor, the SFAA's claim that the USOC has enforced its rights in a discriminatory manner must fail.[30]

---

[28] In fact, the Olympic Charter provides that the USOC "must be autonomous and must resist all pressures of any kind whatsoever, whether of a political, religious or economic nature." Rule 24.

[29] For all of the same reasons indicated above, we reject the SFAA's argument that the United States Government should be viewed as a "joint participant" in the USOC's efforts to enforce its right to use the word "Olympic." See *Burton* v. *Wilmington Parking Authority*, 365 U. S. 715, 725 (1961). The SFAA has failed to demonstrate that the Federal Government can or does exert any influence over the exercise of the USOC's enforcement decisions. Absent proof of this type of "close nexus between the [Government] and the challenged action of the [USOC]," the challenged action may not be "fairly treated as that of the [Government] itself." *Jackson* v. *Metropolitan Edison Co.*, 419 U. S., at 351.

[30] In their petition for certiorari, petitioners argued only that because the USOC is a "state actor" it is prohibited from "selecting among diverse potential users of the word 'Olympic', based upon speech-suppressing and invidiously discriminatory motives." Pet. for Cert. i. The SFAA now argues that under *Shelley* v. *Kraemer*, 334 U. S. 1 (1948), the District Court's entry of the injunction prohibiting the SFAA's use of the word "Olympic" constitutes governmental action sufficient to require a constitutional inquiry into the USOC's motivation in seeking the injunction. This new theory of governmental action is not fairly encompassed within the questions presented and thus is not properly before the Court. See this Court's Rule 21.1(a).

V

Accordingly, we affirm the judgment of the Court of Appeals for the Ninth Circuit.

*It is so ordered.*

JUSTICE O'CONNOR, with whom JUSTICE BLACKMUN joins, concurring in part and dissenting in part.

I agree with the Court's construction of § 110 of the Amateur Sports Act, 92 Stat. 3048, 36 U. S. C. § 380, and with its holding that the statute is "within constitutional bounds." *Ante*, at 535. Therefore, I join Parts I through III of the Court's opinion. But largely for the reasons explained by JUSTICE BRENNAN in Part I–B of his dissenting opinion, I believe the United States Olympic Committee and the United States are joint participants in the challenged activity and as such are subject to the equal protection provisions of the Fifth Amendment. Accordingly, I would reverse the Court of Appeals' finding of no Government action and remand the case for determination of petitioners' claim of discriminatory enforcement.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

The Court wholly fails to appreciate both the congressionally created interdependence between the United States Olympic Committee (USOC) and the United States, and the significant extent to which § 110 of the Amateur Sports Act of 1978, 36 U. S. C. § 380, infringes on noncommercial speech. I would find that the action of the USOC challenged here is Government action, and that § 110 is both substantially overbroad and discriminates on the basis of content. I therefore dissent.

I

For two independent reasons, the action challenged here constitutes Government action. First, the USOC performs important governmental functions and should therefore be considered a governmental actor. Second, there exists "a

sufficiently close nexus between the [Government] and the challenged action" of the USOC that "the action of the latter may be fairly treated as that of the [Government] itself." *Jackson* v. *Metropolitan Edison Co.*, 419 U. S. 345, 351 (1974).

## A

Examination of the powers and functions bestowed by the Government upon the USOC makes clear that the USOC must be considered a Government actor. It is true, of course, that the mere "fact '[t]hat a private entity performs a function *which serves the public* does not make its acts [governmental]'" in nature. *Ante*, at 544 (quoting *Rendell-Baker* v. *Kohn*, 457 U. S. 830, 842 (1982) (emphasis added)). Such a definition, which might cover "all . . . regulated businesses providing arguably essential goods and services," would sweep too broadly. *Jackson, supra*, at 354.

The Court has repeatedly held, however, that "when private. individuals or groups *are endowed by the State* with powers or functions *governmental* in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." *Evans* v. *Newton*, 382 U. S. 296, 299 (1966) (emphasis added). See *Terry* v. *Adams*, 345 U. S. 461 (1953) (private political association and its elections constitute state action); *Marsh* v. *Alabama*, 326 U. S. 501 (1946) (privately owned "company town" is a state actor). Moreover, a finding of government action is particularly appropriate when the function performed is "traditionally the exclusive prerogative" of government. *Jackson* v. *Metropolitan Edison Co., supra,* at 353. Patently, Congress has endowed the USOC with traditional governmental powers that enable it to perform a governmental function.[1]

---

[1] The Court argues that the USOC's function of coordinating private athletic organizations is not one "traditionally the exclusive prerogative" of government, *Jackson* v. *Metropolitan Edison Co.*, 419 U. S., at 353. See *ante*, at 544. Even if the coordination function were the only function delegated to the USOC, which it is not (see discussion of representation function, text this page and *infra*, at 550–553), the Court's argument would

The USOC performs a distinctive, traditional governmental function: it represents this Nation to the world community. The USOC is, by virtue of 36 U. S. C. §§ 374 and 375, our country's exclusive representative to the International Olympic Committee (IOC), a highly visible and influential international body. The Court overlooks the extraordinary representational responsibility that Congress has placed on the USOC. As the Olympic Games have grown in international visibility and importance, the USOC's role as our national representative has taken on increasing significance.

Although the Olympic ideals are avowedly nonpolitical, Olympic participation is inescapably nationalist. Membership in the IOC is structured not according to athletes or sports, but nations.[2] The athletes the USOC selects are viewed, not as a group of individuals who coincidentally are from the United States, but as the team of athletes that represents our Nation. During the House debates on the Amateur Sports Act, Representative Michel expressed it well:

"American athletes will go into these same [1980 Olympic] games as products of our way of life. I do not believe that it is the purpose of the games to set one way

---

not be dispositive. Although the Court has in the past implied that a finding of governmental action likely follows when a private party performs a function that is traditionally the exclusive prerogative of government, e. g., Jackson, supra, at 352–353, the Court has never expressly limited the definition of government function to such circumstances. Such a limitation would be most imprudent, for it would freeze into law a static conception of government, and our judicial theory of government action would cease to resemble contemporary experience. This case illustrates the point. As discussed, infra, at 554–556, Congress reshaped the USOC in 1978 in part to fulfill a role—that of exclusive national coordinator for all amateur athletics related to international competition—which no private party had ever filled.

[2] See IOC Rule 24(B) ("NOCs [National Olympic Committees] shall be the sole authorities responsible for the representation of their respective countries at the Olympic Games as well as at other events held under the patronage of the IOC"), reprinted in International Olympic Committee, Olympic Charter 16 (1985) (emphasis added).

of life against another. But it cannot be denied that spectators, both in Moscow and all over the world, certainly will have such a thought in mind when the events take place. So it would be good for our nation and for the athletes who represent us if the cooperation, spirit of individuality, and personal freedom that are the great virtues of our system are allowed to exert their full influence in the games." 124 Cong. Rec. 31662 (1978).

Every aspect of the Olympic pageant, from the procession of athletes costumed in national uniform, to the raising of national flags and the playing of national anthems at the medal ceremony, to the official tally of medals won by each national team, reinforces the national significance of Olympic participation. Indeed, it was the perception of shortcomings in the *Nation's* performance that led to the Amateur Sports Act of 1978. In the words of the President's Commission, "[t]he fact is that *we* are competing less well and *other nations* competing more successfully because other nations have established excellence in international athletics as a national priority." 1 Final Report of the President's Commission on Olympic Sports 1975–1977, p. ix (1977) (Final Report) (emphasis added).

Private organizations sometimes participate in international conferences resplendent with billowing flags. But the Olympic Games are unique: at stake are significant national interests that stem not only from pageantry but from politics. Recent experience illustrates the inherent interdependence of national political interests and the decisions of the USOC. In his State of the Union Address of January 23, 1980 (a forum, one need hardly add, traditionally reserved for matters of national import), the President announced his opposition to American participation in the 1980 summer Olympic Games in Moscow.[3] The opposition was not premised on, *e. g.*, the financial straits of a private corporation, but

[3] The President's Address is reprinted in 1 Public Papers of the Presidents, Jimmy Carter 1980–1981, p. 196 (1981) (Public Papers), and also in 126 Cong. Rec. 380 (1980).

on the implications of participation for American foreign policy. Echoing the President's concerns, the House of Representatives passed a resolution expressing its opposition to American participation.[4] In a speech on April 10, 1980, the President threatened to take "legal actions [if] necessary to enforce the decision not to send a team to Moscow."[5] Shortly thereafter, with the national and international stakes of the USOC's decision set forth by the President and Congress, and with reports in the press of possible cuts in federal aid to the USOC,[6] the USOC announced that the United States would not participate in the 1980 Olympic Games.[7]

[4] See *id.*, at 562–580. The comments of Representative Ritter during the debate are illuminating: "Moving or boycotting the Olympics is a strong step in the right direction, but it must be seen by all Americans as part of an overall strategy to deal intelligently with the U. S. S. R." *Id.*, at 575.

[5] The President explained: "Under Olympic principles—and this is very important—*athletes represent their nations.* Athletes who are not part of a national team cannot compete in the Olympics. The United States does not wish to be represented in a host country that is invading and subjugating another nation in direct violation of human decency and international law. If legal actions are necessary to enforce the decision not to send a team to Moscow, then I will take those legal actions." Public Papers 636 (emphasis added).

[6] See Dewar & Scannell, White House Looks at USOC's Tax Status, Washington Post, Apr. 9, 1980, pp. A1, A14. See also 6 The Olympian 5 (March 1980) (reprinting President Carter's letter to the USOC, written in his capacity as "Honorary President of the United States Olympic Committee," in which the President explains the "deeper issues . . . at stake" in the USOC's decision); Paul, Historic decision at Colorado Springs means USA will not participate at Moscow, 6 The Olympian 4 (May/June 1980) (hereafter Historic decision) (describing meetings of USOC officials with "Cabinet members and military leaders" to discuss question of United States participation in 1980 Olympic Games).

[7] The Resolution adopted by the USOC House of Delegates on April 12, 1980, stated in part: "Resolved, that since the President of the United States has advised the United States Olympic Committee that in light of international events the national security of the country is threatened, the USOC has decided not to send a team to the 1980 Summer Games in Moscow." 6 The Olympian 6 (May/June 1980). See also Historic decision 4 (quoting USOC President Kane's statment "[o]f course, the USOC will ac-

Although the lesson had been learned long before 1980,[8] this sequence of events laid bare the impact and interrelationship of USOC decisions on the definition and pursuit of the national interest.

There is more to the USOC's public role than representation. The current USOC was born out of governmental dissatisfaction with the performance of the United States in international athletic competition. This dissatisfaction led Congress to grant the USOC unprecedented administrative authority over all private American athletic organizations relating to international competition. The legislative history reveals, contrary to the Court's assumption, *ante*, at 544–545, that no actor in the private sector had ever performed this function, and indeed never could perform it absent enabling legislation.

In 1975, President Ford established a Commission on Olympic Sports to investigate the deteriorating performance of America's athletes at the Olympic Games, and to recom-

---

cept any decision the President makes in view of his analysis of what is best for the country").

[8] The national political ramifications of the USOC's decisions also were evident in 1968, when the USOC suspended American medalists Tommie Smith and John Carlos from the United States Olympic Team. The athletes had called attention to racial troubles in America by raising black-gloved fists during the medal ceremony. D. Chester, The Olympic Games Handbook 177 (1975).

The international political impact of the Games is an inescapable fact of the modern era. For example, Jesse Owens' dramatic performance in the 1936 Olympic Games was widely perceived as a rebuke to Hitler and Nazism. *Id.*, at 90–94. The labeling of the 1960 Taiwanese team as representative of "Formosa" rather than of China prompted one member to march in protest. *Id.*, at 142. And the tragic, politically motivated attack on the Israeli Olympic Team in 1972, in which 11 Israeli athletes, 5 Arabs, and 1 German policeman were killed, forever dispelled any illusion that the Olympics could exist apart from the violent vicissitudes of international politics. *Id.*, at 175. As Avery Brundage recognized in 1972, "[t]he greater and more important the Olympic Games become, the more they are open to commercial, political, and . . . criminal pressure." *Ibid.*

mend solutions. The Commission traced the problems to a lack of central coordination, and "recommend[ed] the institution of a central sports organization for the United States." 1 Final Report 11–13.

In enacting the Amateur Sports Act, Congress gave life to the Commission's primary recommendation, that the USOC be restructured[9] to assume this new role of "central sports organization." See H. R. Rep. No. 95–1627, pp. 8–9 (1978). It greatly expanded the charter of the USOC, giving it "perpetual succession and power to serve as the coordinating body for amateur athletic activity in the United States directly relating to international amateur athletic competition." 36 U. S. C. § 375(a)(1). It also granted the USOC the power to recognize an organization as the "national governing body" for a particular sport, and endowed the USOC with the power to resolve all conflicts and disputes that would arise among the multitude of private organizations and individuals over which it would hold sway. See 36 U. S. C. §§ 375(a)(5), 382b.[10] Thus, in the Amateur Sports Act, Congress granted the USOC the authority and ability to govern national amateur athletics related to international competition.

The public hearing and reporting requirements of the Act reflect the public nature of the USOC's mission. Under

---

[9] The Commission "gave special attention to an examination of the U. S. Olympic Committee (USOC)," and found it "to be a maddening complex of organizations . . . unwieldy in its make-up and structure." 1 Final Report 17. The Commission also found that the USOC "was not [originally] conceived to fill the role of national coordinator of amateur sports. It was simply, by virtue of its name, membership and financial ability, drawn into the vacuum created by the unmet needs in U. S. amateur sports." *Ibid.* The Commission's Final Report concluded: "It goes without saying that the *role of Congress will be crucial.* The creation of a central sports organization . . . and other recommendations will *require* Congressional approval." *Id.*, at 130 (emphasis added).

[10] See H. R. Rep. No. 95–1627, pp. 9–10 (1978) (summarizing the "enlarge[d] . . . purposes and powers of the USOC [that] permit it to carry out its expanded role").

§ 375(b)(2), the USOC may not amend its constitution or bye-laws unless it "gives to all interested persons, prior to the adoption of any amendment, an opportunity to submit written data, views, or arguments concerning the proposed amendment for a period of at least 60 days after the date of publication of the notice." Similarly, the USOC may not recognize a particular amateur sports organization as the "national governing body" for that sport without first holding a public hearing on the matter. 36 U. S. C. § 391(a). The Act institutionalizes yet another public check on the USOC by requiring it annually to "transmit simultaneously to the President and to each House of Congress a detailed report of its operations for the preceding calendar year, including a full and complete statement of its receipts and expenditures and a comprehensive description of the activities and accomplishments of the [USOC] during the preceding year." 36 U. S. C. § 382a(a). The USOC must also submit annual "detailed" reports to the President and Congress on the expenditures of funds made available to it by Congress, and provide "detailed and comprehensive" descriptions of the programs it expects to finance out of Government grant money in the coming year. 36 U. S. C. §§ 382a(b), 384(b).

The function of the USOC is obviously and fundamentally different than that of the private nursing homes in *Blum* v. *Yaretsky*, 457 U. S. 991 (1982), or the private school in *Rendell-Baker* v. *Kohn*, 457 U. S. 830 (1982), or the private Moose Lodge in *Moose Lodge No. 107* v. *Irvis*, 407 U. S. 163 (1972), or even the public utility in *Jackson* v. *Metropolitan Edison Co.*, 419 U. S. 345 (1974). Unlike those entities, which merely provided public services, the USOC has been endowed by the Federal Government with the exclusive power to serve a unique national, administrative, adjudicative, and representational role.[11] The better analogy, then,

---

[11] These attributes would also distinguish the USOC from most of the "69 other federally created private corporations such as the American Legion, Big Brothers—Big Sisters of America, Daughters of the American Revolu-

is to the company town in *Marsh* v. *Alabama*, 326 U. S. 501 (1946), or to the private political party in *Terry* v. *Adams*, 345 U. S. 461 (1953). Like those entities, the USOC is a private organization on whom the Government has bestowed inherently public powers and responsibilities. Its actions, like theirs, ought to be subject to constitutional limits.

## B

Apart from the argument that the USOC is itself a Government actor, there is a second reason to find Government action. At a minimum, this case, like *Burton* v. *Wilmington Parking Authority*, 365 U. S. 715 (1961), is one in which the Government "has so far insinuated itself into a position of interdependence with [the USOC] that it must be recognized as a joint participant in the challenged activity." *Id.*, at 725.[12]

The action at issue in *Burton* was the refusal of a private restaurant that leased space in a public parking facility to serve a black customer. Central to the Court's analysis was what later cases have termed "the symbiotic relationship" of the restaurant to the parking facility. *E. g.*, *Moose Lodge*, *supra*, at 175; *Rendell-Baker*, *supra*, at 843. This relationship provided the "sufficiently close nexus between the State and the challenged action of the [private] entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson*, *supra*, at 351.

The USOC and the Federal Government exist in a symbiotic relationship sufficient to provide a nexus between the

---

tion, Veterans of Foreign Wars of the United States," *ante*, at 543, n. 23, whose presumed status as private actors is not threatened by a finding of Government action here.

[12] The Court fails to mention *Burton* v. *Wilmington Parking Authority*, a case on which petitioner heavily relies. In each of the decisions principally relied on today, the Court thought it important to discuss and distinguish *Burton*. See *Moose Lodge No. 107* v. *Irvis*, 407 U. S. 163, 175 (1972); *Jackson* v. *Metropolitan Edison Co.*, 419 U. S. 345, 357–358 (1974); *Rendell-Baker* v. *Kohn*, 457 U. S. 830, 842–843 (1982); *Blum* v. *Yaretsky*, 457 U. S. 991, 1010–1011 (1982).

USOC's challenged action and the Government. First, as in *Burton*, the relationship here confers a variety of mutual benefits.[13] As discussed *supra*, at 553–556, the Act gave the USOC authority and responsibilities that no private organization in this country had ever held. The Act also conferred substantial financial resources on the USOC, authorizing it to seek up to $16 million annually in grants from the Secretary of Commerce, § 113(a), and affording it unprecedented power to control the use of the word "Olympic" and related emblems to raise additional funds, § 110. As a result of the Act, the United States obtained, for the first time in its history, an exclusive and effective organization to coordinate and administer all amateur athletics related to international competition, and to represent that program abroad.

Second, in the eye of the public, both national and international, the connection between the decisions of the United States Government and those of the United States Olympic Committee is profound.[14] The President of the United States has served as the Honorary President of the USOC. The national flag flies both literally and figuratively over the central product of the USOC, the United States Olympic Team. The connection is not lost on the athletes: who can

---

[13] The Court observed in *Burton* that the relationship between the public authority and the restaurant "confer[red] on each an incidental variety of mutual benefits." 365 U. S., at 724. For example, the location of both parking and dining services in one building could well generate additional demand for each service. *Ibid.* In addition, any improvements in the restaurant's leasehold would not lead to increased taxes since the fee was held by a tax-exempt agency. *Ibid.*

[14] In *Burton*, the Court also found significant evidence that would link the two actors in the public's eye. There was "the obvious fact that the restaurant is operated as an integral part of a public building devoted to a public parking service," *ibid.*, and the fact that "the Authority located at appropriate places [on the facility] official signs indicating the public character of the building, and flew from mastheads on the roof both the state and national flags," *id.*, at 720. This evident interdependence created public perceptions of "grave injustice" that the Court could not ignore. *Id.*, at 724.

imagine an Olympic hopeful postponing a lucrative professional career with the explanation, "I can't pass up this chance to represent the United States Olympic Committee"? More fundamentally, as Representative Michel observed, it is through our participation in the Games that we display "the great virtues of our system." 124 Cong. Rec. 31662 (1978).

Even more importantly, there is a close financial and legislative link between the USOC's alleged discriminatory exercise of its word-use authority and the financial success of both the USOC and the Government.[15] It would certainly be "irony amounting to grave injustice" if, to finance the team that is to represent the virtues of our political system, the USOC were free to employ Government-created economic leverage to prohibit political speech. *Burton, supra,* at 724. Yet that is exactly what petitioners allege. In § 110 of the Act, Congress granted the USOC not a "normal trademark" but an unprecedented right of "exclusive use of the word 'Olympic' without regard to whether use of the word tends to cause confusion," and without "incorporat[ing] defenses available under the Lanham Act." *Ante,* at 530; see Part II–A, *infra.* The purpose of this grant of unique discretion was to enhance the fundraising ability of the USOC. The Court puts it well:

> "Section 110 *directly advances these governmental interests* [promoting the USOC's activities] *by supplying the USOC with the means to raise money* to support the Olympics and encourages the USOC's activities by ensuring that it will receive the benefits of its efforts." *Ante,* at 538–539 (emphasis added).[16]

---

[15] In *Burton,* the Court could not "ignor[e], especially in view of [the restaurant's] affirmative allegation that for it to serve Negroes would injure its business, that profits earned by discrimination not only contribute to, but also are indispensable elements in, the financial success of a governmental agency." *Ibid.*

[16] See also *United States Olympic Committee* v. *Intelicense Corp.,* 737 F. 2d 263, 264 (CA2) (Section 110 intended to enable USOC "to safeguard

If petitioner is correct in its allegation that the USOC has used its discretion to discriminate against certain groups, then the situation here, as in *Burton*, is that "profits earned by discrimination not only contribute to, but also are indispensable elements in, the financial success of a governmental agency." *Burton*, 365 U. S., at 724. Indeed, the required nexus between the challenged action and the Government appears even closer here than in *Burton*. While in *Burton* the restaurant was able to pursue a policy of discrimination because the State had failed to impose upon it a policy of nondiscrimination, the USOC could pursue its alleged policy of selective enforcement only because Congress *affirmatively* granted it power that it would not otherwise have to control the use of the word "Olympic." I conclude, then, that the close nexus between the Government and the challenged action compels a finding of Government action.

## C

A close examination of the USOC and the Government thus reveals a unique interdependence between the two. Although at one time amateur sports was a concern merely of private entities, and the Olympic Games an event of significance only to individuals with a particular interest in athletic competition, that era is passed. In the Amateur Sports Act of 1978, Congress placed the power and prestige of the United States Government behind a single, central sports organization. Congress delegated to the USOC functions

---

the USOC's ability to raise the financial resources that are a critical component of America's capacity to send world class amateur athletes into international competition without the massive government subsidies enjoyed by competitors from other nations"), cert. denied, 469 U. S. 982 (1984); *Stop The Olympic Prison* v. *United States Olympic Committee*, 489 F. Supp. 1112, 1120 (SDNY 1980) (footnote omitted) ("[S]ection [110], read as a whole, evidences a legislative intent to establish strong protection for the Olympic symbols, in part to ensure the market value of licenses for their use. Recent experience has shown such licensing to be a substantial inducement for contributions from a wide variety of commercial corporations, and the drafters of subsection (b) appear to have had this clearly in mind").

that Government actors traditionally perform—the representation of the Nation abroad and the administration of all private organizations in a particular economic sector. The representation function is of particular significance here, in my view, because an organization that need not adhere to the Constitution cannot meaningfully represent this Nation. The Government is free, of course, to "privatize" some functions it would otherwise perform. But such privatization ought not automatically release those who perform Government functions from constitutional obligations. Because the USOC performs a Government function, and because its challenged action is inextricably intertwined with the Government, I would reverse the Court of Appeals finding of no Government action, and remand to the District Court for further proceedings.[17]

## II

Section 110(a)(4) prohibits "any person" from using the word "Olympic" "[w]ithout the consent of the [USOC] for the purpose of trade, to induce the sale of any goods or services, or to promote any theatrical exhibition, athletic performance, or competition."[18] The Court construes this section to give

---

[17] Because both the Court of Appeals and the District Court found no Government action, neither evaluated petitioners' evidence regarding the USOC's policy of selective enforcement. 781 F. 2d 733, 736–737 (CA9 1986); App. 271. .Although the Court recognizes this, *ante,* at 542, n. 22, it nevertheless proceeds to offer its view that petitioners' "claim of discriminatory enforcement is far from compelling." *Ibid.* At this stage of the proceedings, however, the proper forum for any such evaluation is the District Court.

[18] Section 110 of the Amateur Sports Act, 36 U. S. C. § 380, provides in part:

"Without the consent of the [USOC], any person who uses *for the purpose of trade, to induce the sale of any goods or services, or to promote any theatrical exhibition, athletic performance, or competition—*

.        .        .        .        .

"(3) any *trademark,* trade name, sign, symbol, or insignia falsely representing association with, or authorization by, the International Olympic Committee or the [USOC]; or

the USOC authority over use of the word "Olympic" which far surpasses that provided by a standard trademark. The Court ignores the serious First Amendment problems created by its interpretation. It holds that § 110(a)(4) regulates primarily commercial speech, and that this section imposes only those incidental restrictions on expressive speech necessary to further a substantial governmental interest. *Ante*, at 535–541.[19]

I disagree. The statute is overbroad on its face because it is susceptible of application to a substantial amount of noncommercial speech, and vests the USOC with unguided discretion to approve and disapprove others' noncommercial use of "Olympic." Moreover, by eliminating even noncommercial uses of a particular word, it unconstitutionally infringes on the SFAA's right to freedom of expression. The Act also restricts speech in a way that is not content neutral. The Court's justifications of these infringements on First Amendment rights are flimsy. The statute cannot be characterized as a mere regulation of the "manner" of speech, and does not serve any Government purpose that would not effectively be protected by giving the USOC a standard commercial trademark. Therefore, as construed by the Court, § 110(a)(4) cannot withstand the First Amendment challenge presented by petitioners.

### A

The USOC has held a trademark in the word "Olympic" since 1896, *ante*, at 533, and § 110(a)(3) of the Amateur Sports

---

"(4) the words '*Olympic*', 'Olympiad', 'Citius Altius Fortius', or any combination or simulation thereof tending to cause confusion, to cause mistake, to deceive, or to falsely suggest a connection with the [USOC] or any Olympic activity;

"shall be subject to suit in a civil action by the [USOC] for the remedies provided in the Act of July 5, 1946 (60 Stat. 427; popularly known as the Trademark Act of 1946 [Lanham Act, 15 U. S. C. § 1051 *et seq.*])" (emphases added).

[19] In the Court's view, § 110(a)(4) does not necessarily extend to purely expressive speech. *Ante*, at 536, and n. 14.

Act perpetuates the USOC's protection against infringement of its trademarks. To be more than statutory surplusage, then, § 110(a)(4) must provide something more than a normal trademark. Thus, the Court finds that § 110(a)(4) grants to the USOC a novel and expansive word-use authority.[20] In my view, the Act, as interpreted by the Court, is substantially overbroad, violating the First Amendment because it prohibits "a substantial amount of constitutionally protected conduct." *Hoffman Estates* v. *The Flipside, Hoffman Estates, Inc.*, 455 U. S. 489, 494 (1982). The Amateur Sports Act is substantially overbroad in two respects. First, it grants the USOC the remedies of a commercial trademark to regulate the use of the word "Olympic," but refuses to interpret the Act to incorporate the defenses to trademark infringement provided in the Lanham Act. These defenses are essential safeguards which prevent trademark power from infringing upon constitutionally protected speech. Second, the Court construes § 110(a)(4) to grant the USOC unconstitutional authority to prohibit use of "Olympic" in the "promotion of theatrical and athletic events," even if the promotional activities are *noncommercial* or expressive. *Ante*, at 535, 540–541.[21]

---

[20] The legislative history of the Act is consistent with its plain language and indicates that Congress granted word-use authority beyond the power to enforce a trademark. Congress' purpose was to give the USOC authority "to protect certain symbols, emblems, *trademarks*, tradenames *and words* by civil action." H. R. Rep. No. 95–1627, p. 10 (1978) (emphasis added). Significantly, throughout the House Report, Congress refers to the USOC's authority over the use of "Olympic" as a matter separate from the USOC's authority to enforce its trademarks. See, *e. g.*, *id.*, at 6, 7, 10, 15, 37–38. Nowhere in the legislative history is there any hint that Congress equated the USOC's word-use authority over "Olympic" with its trademark power.

[21] In interpreting the Amateur Sports Act, the Court selectively incorporates sections of the Lanham Act. Although the Court refuses to incorporate 15 U. S. C. § 1066 (requirement of consumer confusion) and § 1115 (statutory defenses), it does appear to incorporate § 1127. *Ante*, at 531. This latter section limits the scope of trademark protection to a word "used

## 1

The first part of § 110 prohibits use of the word "Olympic" "for the purpose of trade" or "to induce the sale of any goods or services." There is an important difference between the word-use authority granted by this portion of § 110 and a Lanham Act trademark: the former primarily affects noncommercial speech,[22] while the latter does not.[23]

Charitable solicitation and political advocacy by organizations such as the SFAA[24] may in part consist of commercial

---

by a manufacturer or merchant to identify and distinguish his goods, including a unique product, from those manufactured or sold by others." 15 U. S. C. § 1127 (1982 ed., Supp. III). The Court does not explain, however, the inconsistency between the definition of trademark protection in § 1127 (which limits protection to commercial uses) and the scope of the protection that § 110(a)(4) grants the USOC (including the noncommercial promotion of athletic and theatrical events).

[22] As the District Court recognized:

"You're saying something that I have trouble with. You're talking Trademark Act and trademark law, trademark policies and philosophies of this country. But we have a unique situation here which takes it out of the typical trademark-type of litigation. [Section 110 of the Amateur Sports Act] imposes civil liability . . . upon any person who uses [the word "Olympic"] without U. S. O. C. consent to promote any athletic performance or competition. . . .

". . . The plaintiffs here are seeking to enforce a law . . . which creates a unique and different situation . . . ." App. 265–266.

[23] See *Friedman* v. *Rogers*, 440 U. S. 1, 11 (1979) (trademark protections only extend to "strictly business" matters and involve "a form of commercial speech and nothing more"). In no trademark case that the Court has considered have we permitted trademark protection to ban a substantial amount of noncommercial speech. See, *e. g., Park 'N Fly, Inc.* v. *Dollar Park and Fly, Inc.*, 469 U. S. 189, 201 (1985) (Lanham Act provisions prevent "commercial monopolization" of descriptive language in the public domain).

[24] The SFAA engages in political advocacy and charitable solicitation, activities that are protected by the First Amendment. See *Schaumburg* v. *Citizens for a Better Environment*, 444 U. S. 620, 632 (1980) (charitable solicitation by an organization committed to political advocacy "involve[s] a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that

speech regulated by trademark law, but the expressive element of such speech has been sheltered from unconstitutional harm by Lanham Act defenses. Without them, the Amateur Sports Act prohibits a substantial amount of noncommercial speech.

Trademark protection has been carefully confined to the realm of commercial speech by two important limitations in the Lanham Act. First, the danger of substantial regulation of noncommercial speech is diminished by denying enforcement of a trademark against uses of words that are not likely "to cause confusion, to cause mistake, or to deceive." See 15 U. S. C. § 1066. Confusion occurs when consumers make an incorrect mental association between the involved commercial products or their producers. See E. Vandenburgh, Trademark Law and Procedure § 5.20, p. 139 (2d ed. 1968). In contrast, § 110(a)(4) regulates even nonconfusing uses of "Olympic." For example, it may be that while SFAA's use of the word "Olympic" would draw attention to certain similarities between the "Gay Olympic Games" and the "Olympic Games," its use might nevertheless not confuse consumers. Because § 110 does not incorporate the requirement that a defendant's use of the word be confusing to consumers, it regulates an extraordinary range of noncommercial speech.[25]

---

are within the protection of the First Amendment"). It is chartered as a nonprofit, educational organization whose purpose is to inform the general public about the "gay movement" and "to diminish the ageist, sexist and racist divisiveness existing in all communities regardless of sexual orientation." App. 93, 102. The SFAA solicited charitable donations and distributed T-shirts, buttons, and posters using the word "Olympic."

[25] In its complaint, the USOC included a cause of action under § 14330 of the California Business and Professional Code (1987), which protects trademark holders against uses which dilute the value of their trademark. App. 7–14. The USOC has not explained, however, why the remedies provided by the California dilution statute are insufficient.

It is worth noting that, although some state dilution statutes do not require proof of actual confusion, they do impose other limitations that are not imposed by § 110. "The dilution doctrine cannot and should not be carried to the extreme of forbidding use of a trademark on any and all prod-

The fair-use defense also prevents the award of a trademark from regulating a substantial amount of noncommercial speech. See 15 U. S. C. § 1115(b)(4). The Lanham Act allows "the use of the name, term, or device . . . which is descriptive of and used fairly and in good faith only to describe to users the goods or services of such party." *Ibid.*[26] Again, a wide array of noncommercial speech may be characterized as merely descriptive of the goods or services of a party, and thus not intended to propose a commercial transaction. For example, the SFAA's description of its community services appears to be regulated by § 110, although the main purpose of such speech may be to educate the public about the social and political views of the SFAA. Congress' failure to incorporate this important defense in § 110(a)(4) confers an unprecedented right on the USOC. See *Park 'N Fly, Inc.* v. *Dollar Park and Fly, Inc.*, 469 U. S. 189, 200–201 (1985) (noting that fair-use doctrine assists in preventing the "unprecedented" creation of "an exclusive right to use language that is descriptive of a product").[27]

---

ucts and services, however remote from the owner's usage." 2 J. McCarthy, Trademarks and Unfair Competition § 24:16, p. 229 (2d ed. 1984); see also 1 J. Gilson, Trademark Protection and Practice § 5.05[9], p. 5–42 (1986). Only "strong" trademarks are protected by dilution statutes, and the plaintiff's trademark must not previously have been diluted by others. 2 McCarthy, *supra*, § 24:14, p. 224; E. Vandenburgh, Trademark Law and Procedure § 5.20, p. 150 (2d ed. 1968). It is generally necessary to show similarity between trademarks and a "likelihood" of confusion. See 1 Gilson, *supra*, § 5.05[9], p. 5–42. Moreover, state dilution statutes do not generally apply to descriptive, nontrademark uses of words.

[26] It is important to note that even after a trademark has acquired secondary meaning, it may be used in a good-faith descriptive manner under the Lanham Act. See 1 McCarthy, *supra*, § 11:16, p. 475.

[27] One commentator has described the First Amendment significance of this Lanham Act defense with respect to the regulation of commercial speech:

"*Virginia Pharmacy*[, 425 U. S. 748 (1976),] and the underlying policies in favor of free commercial speech are closely parallel to those which apply to the branch of trademark law dealing with descriptive words and

In sum, while the USOC's trademark of "Olympic" allows the USOC to regulate use of the word in the "strictly business" context, the USOC's authority under § 110(a)(4) to regulate nonconfusing and good-faith descriptive uses of the word "Olympic" grants the USOC discretion to prohibit a substantial amount of noncommercial speech. Section 110(a)(4) is therefore substantially overbroad. See *Secretary of State of Md.* v. *Joseph H. Munson Co.*, 467 U. S. 947, 959 (1984); *Schaumburg* v. *Citizens for a Better Environment*, 444 U. S. 620, 632 (1980).

## 2

A key Lanham Act requirement that limits the impact of trademarks on noncommercial speech is the rule that a trademark violation occurs only when an offending trademark is applied to *commercial* goods and services. See 15 U. S. C. §§ 1066 and 1127. The Amateur Sports Act is not similarly qualified. Section 110(a)(4) "allows the USOC to prohibit the use of 'Olympic' for promotion of theatrical and athletic events,"[28] even if such uses "go beyond the 'strictly business'

---

phrases. The same or very similar policies have been followed for more than a half century by courts and legislatures applying the rule of trademark law that descriptive words and terms cannot be monopolized as trademarks. . . . Without such availability, fair and open competition might be impaired, the available vocabulary of descriptive words would be reduced, advertisers could not freely describe their products, and the public might be deprived of information necessary to make purchase decisions. . . . If the court finds . . . that defendant is using the term in a purely descriptive manner, it presumably can support its holding by reliance on the *Virginia Pharmacy* doctrine and policies." 1 Gilson, *supra*, § 5.09[5], pp. 5–88 to 5–89 (footnotes omitted).

[28] Noncommercial promotion may include critical reviews of theatrical performances, anticipatory notices and descriptions in the media of athletic competitions, and distribution of educational literature describing the sociopolitical reasons for holding the public events. See *Central Hudson Gas & Elec. Corp.* v. *Public Service Comm'n*, 447 U. S. 557, 580 (1980) (STEVENS, J., concurring in judgment) (promotional advertising encompasses more than commercial speech). For example, in response to the injunction, the SFAA excised the use of "Olympic" from its promotional

context." *Ante*, at 535; see also *ante*, at 540 (statute extends to promotional uses "even if the promotion is not to induce the sale of goods").[29] This provision necessarily regulates only noncommercial speech, since every possible commercial use of the word "Olympic" is regulated by preceding sections of the statute.[30]

While the USOC has unquestioned authority to enforce its "Olympic" trademark against the SFAA, § 110(a)(4) gives it additional authority to regulate a substantial amount of noncommercial speech that serves to promote social and political ideas. The SFAA sponsors a number of nonprofit-making theatrical and athletic events, including concerts, film screenings, and plays.[31] These public events are aimed at educating the public about society's alleged discrimination based on

and educational literature, cautioned its phone operators to refrain from using the term, and advised media representatives not to use this word in conjunction with articles about the cultural and athletic events sponsored by the SFAA. App. 88–92, 94–115.

[29] Before concluding that the incidental regulation of some expressive speech is justified, *ante*, at 541, the Court states that it is not clear that § 110 restricts purely expressive uses of "Olympic," *ante*, at 536. Such vagueness suggests that the Amateur Sports Act dangerously chills even purely expressive speech. In the instant case, a local newspaper organization excised "Olympic" from an edition in response to the imposed injunction. App. 89. See also n. 28, *supra*.

[30] Every commercial use of "Olympic" is regulated under passages of the statute which precede this part of § 110. The USOC is authorized to regulate use of the word as a trademark under § 110(a)(3). All remaining commercial uses of "Olympic" not regulated by that subsection are governed by § 110(a)(4)'s authorization of the USOC to control the use of "Olympic" by "any person . . . for the purpose of trade" or "to induce the sale of any goods or services." Consistent with the Court's interpretation, this authorization gives the USOC the right to Lanham Act remedies, even if the SFAA's use of "Olympic" is noncommercial, nonconfusing, and merely descriptive.

[31] The SFAA's amateur athletic events include competition by age-groups with mixed genders in some sports to promote a climate of competition that emphasizes personal improvement rather than winning, and promotes goodwill toward all ages, sexes, and races. App. 98.

sexual orientation, age, sex, and nationality. App. 93–99. In conjunction with these events, the SFAA distributes literature describing the meaning of the Gay Olympic Games. References to "Olympic" in this literature were deleted in response to the injunction, because of § 110's application to the promotion of athletic and theatrical events. *Id.*, at 88–89, 94, 97.

3

Thus, contrary to the belief of the Court, § 110 may prohibit a substantial amount of noncommercial speech, and is therefore unconstitutionally overbroad. *Schaumburg* v. *Citizens for a Better Environment, supra*, at 632. This overbreadth is particularly significant in light of the unfettered discretion the Act affords to the USOC to prohibit other entities from using the word "Olympic." Given the large number of such users,[32] this broad discretion creates the potential for significant suppression of protected speech. "[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth* v. *Birmingham*, 394 U. S. 147, 150–151 (1969). See also *Niemtko* v. *Maryland*, 340 U. S. 268, 272 (1951). "Proof of an abuse of power in the particular case has never been deemed a requisite for attack on the constitutionality of a statute purporting to license the dissemination of ideas." *Thornhill* v. *Alabama*, 310 U. S. 88, 97 (1940). This broad discretion, with its potential for abuse, also renders § 110 unconstitutionally overbroad on its face.

B

The Court concedes that "some" uses of "Olympic" prohibited under § 110 may involve expressive speech. *Ante*, at

---

[32] See *Brief for Respondents* 40–41. In Los Angeles and Manhattan alone, there are over 200 enterprises and organizations listed in the telephone directories whose names start with the word "Olympic." 789 F. 2d 1319, 1323 (CA9 1986) (Kozinski, J., dissenting).

535. But it contends that "[b]y prohibiting the use of one word for particular purposes, neither Congress nor the USOC has prohibited the SFAA from conveying its message. . . . Section 110 restricts only the *manner* in which the SFAA may convey its message." *Ante,* at 536 (emphasis added). Section 110(a)(4) cannot be regarded as a mere time, place, and manner statute, however. By preventing the use of the word "Olympic," the statute violates the First Amendment by prohibiting dissemination of a message for which there is no adequate translation.

In *Cohen* v. *California,* 403 U. S. 15 (1971), we rejected the very notion advanced today by the Court when considering the censorship of a single four-letter expletive:

> "[W]e cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process. Indeed, governments might soon seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views. We have been able . . . to discern little social benefit that might result from running the risk of opening the door to such grave results." *Id.,* at 26.

The Amateur Sports Act gives a single entity exclusive control over a wide range of uses of a word with a deep history in the English language and Western culture. Here, the SFAA intended, by use of the word "Olympic," to promote a realistic image of homosexual men and women that would help them move into the mainstream of their communities. As Judge Kozinski observed in dissent in the Court of Appeals, just as a jacket reading "I Strongly Resent the Draft" would not have conveyed Cohen's message, so a title such as "The Best and Most Accomplished Amateur Gay Athletes Competition" would not serve as an adequate translation of petitioners' message. 789 F. 2d 1319, 1321 (CA9 1986). Indeed, because individual words carry "a life and force of their own," translations never fully capture the sense

of the original.[33]   The First Amendment protects more than the right to a mere translation.   By prohibiting use of the word "Olympic," the USOC substantially infringes upon the SFAA's right to communicate ideas.

## C

The Amateur Sports Act also violates the First Amendment because it restricts speech in a way that is not content neutral.   A wide variety of groups apparently wish to express particular sociopolitical messages through the use of the word "Olympic," but the Amateur Sports Act singles out certain of the groups for favorable treatment.   As the Court observes, *ante*, at 542–543, n. 22, Congress encouraged the USOC to allow the use of "Olympic" in athletic competitions held for youth ("Junior Olympics" and "Explorer Olympics") and handicapped persons ("Special Olympics"), 36 U. S. C. § 374(13), while leaving to the USOC's unfettered discretion the question whether other groups may use it. See, *e. g.*, *USOC* v. *Golden Age Olympics, Inc.*, Opposition No. 62,426 (Patents and Trademarks Comm'n, June 4, 1981) (reprinted in App. 383) (denial of use of "Olympic" to senior citizens group); *USOC* v. *International Federation of Body Builders*, 219 USPQ 353 (DC 1982) (denial of use to organization promoting bodybuilding).

The statute thus encourages the USOC to endorse particular noncommercial messages, while prohibiting others.   Such

---

[33] James Boyd White has written:

"When we look at particular words, it is not their translation into statements of equivalence that we should seek but an understanding of the possibilities they represent for making and changing the world. . . . Such words do not operate in ordinary speech as restatable concepts but as words with a life and force of their own.   They cannot be replaced with definitions, as though they were parts of a closed system, for they constitute unique resources, of mixed fact and value, and their translation into other terms would destroy their nature.   Their meaning resides not in their reducibility to other terms but in their irreducibility. . . . They operate indeed in part as gestures, with a meaning that cannot be restated." J. White, When Words Lose Their Meaning 11 (1984).

a scheme is unacceptable under the First Amendment.[34] "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department of Chicago* v. *Mosley*, 408 U. S. 92, 95 (1972). See also *Regan* v. *Time, Inc.*, 468 U. S. 641, 648–649 (1984) (holding that Government determination of publishability of photographs based on whether message is "newsworthy or educational" constitutes content-based discrimination in violation of First Amendment).

## D

Even if § 110(a)(4) may fairly be characterized as a statute that directly regulates only commercial speech, its incidental restrictions on First Amendment freedoms are greater than necessary to further a substantial Government interest. The sole Government interest proffered for giving the USOC sweeping powers over the use of "Olympic" is the desire to provide a financial subsidy to the USOC. Brief for Respondents 24. At minimum, it is necessary to consider whether the USOC's interest in use of the word "Olympic" could not adequately be protected by rights coextensive with those in the Lanham Act, or by some other restriction on use of the word.

In the absence of § 110(a)(4), the USOC would have authority under the Lanham Act to enforce its "Olympic" trademark against commercial uses of the word that might cause

---

[34] Due to the particular meaning of "Olympic," the suppression of the use of the word has its harshest impact on those groups that may benefit most from its use, such as those with debilitating birth defects, see *USOC* v. *March of Dimes Birth Defects Foundation*, No. CA 83–539 (Colo., July 1, 1983), and the aged, see *USOC* v. *Golden Age Olympics, Inc.*, Opposition No. 62,426. Cf. *Virginia Pharmacy Bd.* v. *Virginia Citizens Consumer Council, Inc.*, 425 U. S. 748, 763 (1976).

consumer confusion and a loss of the mark's distinctiveness.[35] There is no evidence in the record that this authority is insufficient to protect the USOC from economic harm. The record and the legislative history are barren of proof or conclusion that noncommercial, nonconfusing, and nontrademark use of "Olympic" in any way dilutes or weakens the USOC's trademark. See *Stop The Olympic Prison* v. *United States Olympic Committee*, 489 F. Supp. 1112, 1123 (SDNY 1980) (dismissing USOC's dilution claim because no actual proof of such injury). No explanation is offered, for instance, as to how the use of "Olympic" in theatrical events in conjunction with a disclaimer "not associated with [the USOC]" harms the economic force of the trademark. See Brief for Petitioners 12. The Court contends that § 110 may prohibit uses of "Olympic" because it protects an "image carefully cultivated by the USOC." *Ante*, at 541. Again, there is no proof in the record that the Lanham Act inadequately protects the USOC's commercial interest in its image or that the SFAA has harmed the USOC's image by its speech.[36]

---

[35] In this litigation, the USOC filed causes of action under the Lanham Act, the Amateur Sports Act, and the California dilution statute. App. 7–14.

[36] Nor is there any evidence that SFAA's expressive speech caused economic or reputational harm to the USOC's image. In *Spence* v. *Washington*, 418 U. S. 405 (1974), a State asserted a similar interest in the integrity of America's flag as " 'an unalloyed symbol of our country,'" and contended that there is a substantial Government interest in "preserving the flag as 'an important symbol of nationhood and unity.'" *Id.*, at 421. The Court considered whether a State could withdraw "a unique national symbol from the roster of materials that may be used as a background for communications." *Id.*, at 423 (REHNQUIST, J., dissenting). It reviewed a state law that limited the use of the American flag and forbade the public exhibition of a flag that was distorted or marked. *Id.*, at 407, 422. The appellant was convicted for violating the statute by displaying the flag upside down in the window of his apartment with a peace symbol attached to it. Eight Members of the Court held that the statute was unconstitutional as applied to appellant's activity. "There was no risk that appellant's acts would mislead viewers into assuming that the Government endorsed his view-

Language, even in a commercial context, properly belongs to the public, unless the Government's asserted interest is substantial, and unless the limitation imposed is no more extensive than necessary to serve that interest. See *ante*, at 537, n. 16; see also *Park 'N Fly, Inc.* v. *Dollar Park and Fly, Inc.*, 469 U. S., at 215, n. 21 (STEVENS, J., dissenting), citing *Otto Roth & Co.* v. *Universal Foods Corp.*, 640 F. 2d 1317, 1320 (CCPA 1981) (recognizing importance of "free use of the language" in commercial speech context).[37] The Lanham Act is carefully crafted to prevent commercial monopolization of language that otherwise belongs in the public domain. See *Park 'N Fly, Inc.*, *supra*, at 200–201.[38] The USOC demonstrates no need for additional protection. In my view, the SFAA therefore is entitled to use the word "Olympic" in a nonconfusing and nonmisleading manner in the noncommercial promotion of a theatrical or athletic event, absent proof of resultant harm to the USOC.

I dissent.

---

point," and "his message was direct, likely to be understood, and within the contours of the First Amendment." *Id.*, at 414–415. The Court concluded that since the state interest was not "significantly impaired," the conviction violated the First Amendment. *Id.*, at 415. Similarly, in this case, the SFAA's primary purpose was to convey a political message that is nonmisleading and direct. This message, like the symbolic speech in *Spence*, is protected by the First Amendment.

[37] See also *Bada Co.* v. *Montgomery Ward & Co.*, 426 F. 2d 8, 11 (CA9) ("[O]ne competitor will not be permitted to impoverish the language of commerce by preventing his fellows from fairly describing their own goods"), cert. denied, 400 U. S. 916 (1970).

[38] The Lanham Act "provides national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." *Park 'N Fly, Inc.*, 469 U. S., at 198.