75 F.3d 1401
 64 USLW 2526, 96 Cal. Daily Op. Serv. 958,
96 Daily Journal D.A.R. 1592
 AMERICAN BANKERS MORTGAGE CORPORATION,
Plaintiff-counter-defendant-Appellant.
v.
FEDERAL HOME LOAN MORTGAGE CORPORATION, d/b/a Freddie Mac,
Defendant-counter-plaintiff-Appellee,
and
Countrywide Credit Industries, Inc., Defendant-Appellee.
 No. 94-55967.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 14, 1995.
Decided Feb. 12, 1996.
 
 James L. Lysaght, Lysaght, Lysaght & Kramer, Lake Success, New York, for plaintiff-counter-defendant-appellant.
 Diane M. Ennist, Federal Home Loan Mortgage Corporation, McLean, Virginia, for defendant-counter-plaintiff-appellee.
 Appeal from the United States District Court for the Central District of California; William J. Rea, District Judge, Presiding.
 Before: FLETCHER, CANBY, and HAWKINS, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 American Bankers Mortgage Corporation ("ABM") appeals a district court judgment dismissing certain of its claims for failure to state a claim, granting summary judgment against it on its remaining claims, and granting summary judgment for the Federal Home Loan Mortgage Corporation ("Freddie Mac") on certain of its counterclaims. We have jurisdiction under 28 U.S.C. § 1291 and affirm.
 
 FACTUAL BACKGROUND
 
 2
 Freddie Mac, a federally chartered corporation, purchases home mortgages from lenders and sells securities to the public to fund the purchases. Mortgages are only purchased from, and serviced by, approved seller/servicers under the terms of contracts, the most important document of which is the Sellers' & Servicers' Guide, a two-volume looseleaf publication. The Guide sets forth standards and requirements with which a seller/servicer must comply in order to sell mortgages to, and service mortgages for, Freddie Mac. For example, seller/servicers must provide certain complete and accurate reports to Freddie Mac, maintain certain accounting records, maintain specified underwriting and quality control procedures, and maintain delinquency rates within certain limits. The Guide provides that Freddie Mac may terminate a seller/servicer's approval at its discretion for breach of any representation or warranty required of it by the Guide.
 
 
 3
 ABM, a mortgage banking corporation organized and licensed under California law, became an approved Freddie Mac seller/servicer in October 1983. In December 1991 outside auditors found that ABM was underreporting to Freddie Mac delinquencies on the mortgages it serviced. Although ABM claims that the reporting requirement was unclear as to the definition of reportable delinquencies, the auditor found underreporting even under the interpretation most favorable to ABM. In October 1991, for example, ABM should have reported 98 delinquencies under its interpretation rather than the 20 it did report, and the outside auditor (and Freddie Mac) read the Guide to require that some 220 loans should have been reported as delinquent. ABM later admitted the underreporting and provided figures for November and December 1991 indicating that 244 and 247 delinquencies, respectively, had gone unreported under Freddie Mac's interpretation of the Guide requirements. The company asserted that the underreporting resulted entirely from unauthorized action by a single employee, ABM's executive vice-president and servicing manager. The audit also found that ABM's custodial bank account for Freddie Mac contained improperly commingled funds in violation of the Guide requirements.
 
 
 4
 ABM notified Freddie Mac of the reporting problem and made several attempts to persuade Freddie Mac to allow it to remedy its failure to comply with Guide standards and requirements, but in February 1992 Freddie Mac suspended ABM's seller/servicer eligibility pending an investigation and then terminated ABM's status as a seller/servicer for 13 enumerated reasons, including ABM's failure to submit accurate delinquency reports, its violation of its obligation not to misstate or omit any material fact in any representation to Freddie Mac, its unacceptably high delinquency rate, its failure to maintain adequate quality control, and its commingling of funds. At the time Freddie Mac gave oral notice of termination, it apparently repossessed documents relating to over 3,000 loans, allegedly including some loans being serviced by ABM for owners other than Freddie Mac. ABM alleges that Freddie Mac transferred the servicing of its loans to Countrywide Credit Industries. Freddie Mac also seized a custodial account held by ABM for Freddie Mac containing over $4 million, $500,000 of which allegedly did not belong to Freddie Mac.
 
 
 5
 In March 1992, ABM filed with Freddie Mac an appeal of its termination as allowed by the Guide, conceding the validity of "many" of the reasons for termination given in the February notice but asserting that the violations resulted from oversight rather than intentional or reckless management conduct. Freddie Mac denied the appeal in April 1992.
 
 
 6
 In June 1992, Freddie Mac demanded that ABM pay it $1,269,963.46 allegedly due Freddie Mac on the mortgages formerly serviced by ABM, but ABM has not paid any portion of this sum.
 
 PROCEEDINGS BELOW
 
 7
 In March 1993, ABM filed a complaint in the Central District of California against Freddie Mac and Countrywide Credit alleging breach of contract, tortious breach of an implied covenant of good faith and fair dealing, violation of Fifth Amendment due process rights, conversion, and forfeiture. On May 12, 1993 the district court granted Freddie Mac's motion to dismiss for failure to state a claim the counts of tortious breach and due process violations. A motion by ABM to reconsider the dismissal was denied in September 1993.
 
 
 8
 On May 28, 1993, Freddie Mac filed a counterclaim for breach of contract, negligent misrepresentation, conversion, specific recovery of personal property, and the establishment of a constructive trust.
 
 
 9
 After discovery ended in January 1994, Freddie Mac and Countrywide moved in February 1994 for summary judgment in their favor on the remaining counts of ABM's complaint and on the breach of contract and specific recovery counts of the counterclaim. On June 8, 1994 the District court granted the motion, dismissing most of ABM's claims against both defendants and awarding Freddie Mac $1,947,076.47, together with interest and costs. On June 9, 1994, the court entered a stipulation and order by which the parties voluntarily dismissed ABM's one remaining claim for conversion of $500,000 and Freddie Mac's three remaining claims; Freddie Mac agreed to set the $500,000 off against its $1.9 million award, which it apparently viewed as largely uncollectible.
 
 STANDARD OF REVIEW
 
 10
 Dismissal for failure to state a claim on which relief can be granted is reviewed de novo. Stone v. Travelers Corp., 58 F.3d 434, 436-37 (9th Cir.1995). A grant of summary judgment is also reviewed de novo. Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994).
 
 DISCUSSION
 
 11
 I. Freddie Mac's Actions Were Not Subject to the Fifth Amendment
 
 
 12
 Appellant asserts that the district court erred in concluding that its allegation that Freddie Mac violated its Fifth Amendment rights by terminating its eligibility without due process failed to state a claim. Because the Fifth Amendment Due Process Clause applies only to the federal government, Public Utilities Commission v. Pollak, 343 U.S. 451, 461, 72 S.Ct. 813, 820, 96 L.Ed. 1068 (1952), Freddie Mac is not restricted by that Clause unless it is part of the federal government or its actions constituted federal action. We conclude that neither is the case.
 
 A. Freddie Mac Is Not a Government Entity
 
 13
 The Supreme Court's recent decision in Lebron v. National Railroad Passenger Corp., --- U.S. ----, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995), provides the appropriate framework for analysis of Freddie Mac's governmental status. The Court there held that "where ... the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." Id. at ---- - ----, 115 S.Ct. at 974-75. Since Freddie Mac is a corporation chartered by Congress, the two relevant criteria for judging Freddie Mac's status as a federal entity for Fifth Amendment purposes are the extent to which its objectives are governmental and the extent to which the government directs and controls the corporation's pursuit of those objectives.
 
 1. Objectives
 
 14
 The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) wrote the purposes of Freddie Mac into law for the first time.[1] In the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, Congress emphasized the public nature of these purposes.[2] The congressional purposes for Freddie Mac are clearly designed to serve the public interest by increasing the availability of mortgages on housing for low- and moderate-income families and by promoting nationwide access to mortgages. At least one Court of Appeals has held that Freddie Mac "certainly furthers an important federal mission, and does act as a federal agency or instrumentality in this sense". Mendrala v. Crown Mortgage Co., 955 F.2d 1132, 1139 (7th Cir.1992) (finding Freddie Mac nonetheless not a federal agency for claims under the Federal Tort Claims Act). The Mendrala court also found Freddie Mac's purposes sufficiently governmental to qualify the corporation to enjoy protection from estoppel under the doctrine of Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947): "The FHLMC has a public statutory mission: to maintain the secondary mortgage market and assist in meeting low- and moderate-income housing goals." 955 F.2d at 1140-41 (footnote omitted) (emphasis added). Thus, Freddie Mac's purposes are "federal governmental objectives" for the purpose of analyzing whether or not Freddie Mac is a government entity.
 
 2. Control
 
 15
 The government, however, does not "control[ ] the operation of [Freddie Mac] through its appointees", Lebron, --- U.S. at ----, 115 S.Ct. at 974. Freddie Mac's board of directors consists of 18 persons, of whom 13 are elected annually by the voting common shareholders.[3] 12 U.S.C. § 1452(a)(2)(A). Freddie Mac has apparently issued nearly 60 million common shares of stock, and its shares are publicly traded on the New York Stock Exchange. Amtrak, by contrast, had only four private shareholders at the time Lebron was decided. --- U.S. at ----, 115 S.Ct. at 968. Freddie Mac's five remaining directors are appointed annually by the President, independently of the Senate. Thus, the U.S. government is entitled to appoint fewer than one-third of Freddie Mac's directors. Although the President must choose at least 1 director from each of four categories (the homebuilding industry, the mortgage lending industry, the real estate industry, and the consumer or low-income-housing communities), 12 U.S.C. § 1452(a)(2)(A), these provisions appear to be irrelevant to the issue of government control under Lebron, since the Court there viewed analogous requirements for presidential appointments to Amtrak's board as only "a restriction imposed by one of the political branches upon the other". Lebron, --- U.S. at ----, 115 S.Ct. at 973.
 
 
 16
 On the other hand, the law governing Amtrak effectively provided at the time of Lebron for complete government control of that corporation's board, which consists of nine members: the Secretary of Transportation (ex officio ); three directors chosen for four-year terms by the President with the advice and consent of the Senate; two directors appointed for two-year terms by the President with no Senate involvement; two directors elected for one-year terms by the holders of preferred stock, all of which was owned by the United States at the time of the decision in Lebron, --- U.S. at ----, 115 S.Ct. at 968; and Amtrak's president, who is appointed by the Board itself and serves at its pleasure. 49 U.S.C. § 24302.[4] The Lebron Court noted that "Amtrak's four private shareholders have not been entitled to vote in selecting the board of directors since 1981". --- U.S. at ----, 115 S.Ct. at 968. Given that "six of the corporation's eight externally named directors ... are appointed directly by the President of the United States--four of them ... with the advice and consent of the Senate", id. at ----, 115 S.Ct. at 973, the Court concluded that Amtrak was a government-controlled corporation.
 
 
 17
 The current governance structure of Freddie Mac affords the government far less control over that corporation's operations than it had over Amtrak's operations in Lebron. Freddie Mac is far more analogous to the Communications Satellite Corporation (Comsat); only 3 of Comsat's 15 directors are appointed by the President. 47 U.S.C. § 733(a). The Lebron Court found Comsat to be "genuinely private". Id. (emphasis in original). Thus, the second element of the Lebron test for determining whether a federally chartered corporation is a federal entity, the government's control over the corporation, is missing in this case.
 
 
 18
 ABM argues that Freddie Mac is a federal agency because 12 U.S.C. § 1452(f) provides that the corporation "shall be deemed to be an agency included in sections 1345 and 1442 of ... Title 28". Those sections of the judicial code grant federal district courts original jurisdiction over suits "commenced ... by any agency", 28 U.S.C. § 1345, and removal jurisdiction over suits "commenced in a State court against any ... officer of the United States or any agency thereof", 28 U.S.C. § 1442. The fact that Congress felt it necessary to provide in Freddie Mac's governing statute that the corporation shall be deemed an agency under those provisions--"[n]otwithstanding section 1349 of Title 28", 12 U.S.C. § 1452(f), which provides that mere federal incorporation shall not confer federal jurisdiction--demonstrates that Congress did not believe that Freddie Mac was an "agency", at least for Title 28 purposes. Further, federal jurisdiction for suits for or against the corporation is only one factor to be considered in determining the governmental purposes and control of a federally chartered corporation.
 
 
 19
 Two cases cited by ABM in support of finding Freddie Mac a governmental entity are not relevant because both were decided before FIRREA restructured Freddie Mac and neither squarely addressed whether Freddie Mac was subject to constitutional provisions such as the Fifth Amendment. Rocap v. Indiek, 539 F.2d 174, 176 (D.C.Cir.1976) (Freddie Mac was a "Government controlled corporation" under 5 U.S.C. § 552(e) and subject to FOIA because corporation's board "is composed of the three members of the Federal Home Loan Bank Board ... and its capital stock is non-voting and held solely by the twelve Federal Home Loan Banks"); McCauley v. Thygerson, 732 F.2d 978, 982 (D.C.Cir.1984) (Freddie Mac's status for purpose of employment relations "ultimately turn[ed] ... on functional considerations of the effect that application of broad notions of promissory estoppel would have in light of the congressional intent expressed in FHLMC's enabling act"). Even the Seventh Circuit's opinion in Mendrala is of little relevance, since its findings that Freddie Mac both was and was not a federal agency or instrumentality were expressly confined to the particular contexts of the Federal Tort Claims Act and the Merrill doctrine, respectively. Moreover, two district courts, in addition to the one that decided this case, have expressly found that Freddie Mac's termination of a seller/servicer was not subject to the Fifth Amendment. Liberty Mortgage Banking, Ltd. v. Federal Home Loan Mortgage Corp., 822 F.Supp. 956, 958-60 (E.D.N.Y.1993) (Freddie Mac was private corporation rather than government agency; decision to terminate plaintiff as seller/servicer could not be deemed government action); FBMC Fin., Inc. v. Federal Home Loan Mortgage Corp., No. 91 cv. 1226-R (S.D.Cal. Sept. 26, 1991) (discussed in Liberty Mortgage, 822 F.Supp. at 960). In addition, two other circuits have held that the Federal National Mortgage Association ("Fannie Mae") is not subject to the Fifth Amendment Due Process Clause. Northrip v. Federal National Mortgage Ass'n, 527 F.2d 23, 30 (6th Cir.1975) (corporation was federally chartered and regulated but stock traded on New York Stock Exchange and only 5 of 15 directors were appointed by President); Roberts v. Cameron-Brown Co., 556 F.2d 356, 359 (5th Cir.1977) (relying on Northrip and holding that FNMA's activities did not qualify as governmental action).
 
 
 20
 While Freddie Mac is chartered to pursue federal governmental objectives, the level of government control over the corporation is so much lower than that exercised over Amtrak we conclude that, upon an application of Lebron principles, that Freddie Mac is not a government agency subject to the Fifth Amendment's Due Process Clause.
 
 
 21
 B. Freddie Mac's Actions Did Not Constitute Federal Action for Constitutional Purposes
 
 
 22
 ABM argues that even if Freddie Mac is not a governmental entity, its actions in terminating appellants as seller/servicers should be subject to the requirements of the Fifth Amendment's Due Process Clause because the terminations were federal action. "The standards utilized to find federal action for purposes of the Fifth Amendment are identical to those employed to detect state action subject to the strictures of the Fourteenth Amendment." Geneva Towers Tenants Org. v. Federated Mortgage Investors, 504 F.2d 483, 487 (9th Cir.1974). Because the Court's consideration of the state action question in San Francisco Arts & Athletics, Inc. v. United States Olympic Committee, 483 U.S. 522, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987), is both recent and involved a federally chartered corporation, it provides the most appropriate standards for analysis in this case.[5] The San Francisco Arts & Athletics Court examined (1) the nexus between the government and the challenged action, (2) whether the alleged government actor performed functions traditionally exclusively reserved to the government, and (3) whether the government coerced or encouraged the challenged action. Id. at 543-46, 107 S.Ct. at 2984-86.
 
 1. Nexus
 
 23
 Appellant suggests a nexus between the government and Freddie Mac's termination by reciting a litany of U.S. government regulations applicable to Freddie Mac.[6] However, "[e]ven extensive regulation by the government does not transform the actions of the regulated entity into those of the government". San Francisco Arts & Athletics, 483 U.S. at 544, 107 S.Ct. at 2985 (citing Jackson v. Metro. Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974)). The Jackson Court explained that even "extensive and detailed [regulation], as in the case of most public utilities" does not turn private action into state action. 419 U.S. at 350, 95 S.Ct. at 453. Instead, "the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself". Id. at 351, 95 S.Ct. at 453. The regulations regarding Freddie Mac appear substantially less "extensive and detailed" than those typically imposed on public utilities. More importantly, ABM has failed to allege any nexus between those regulations and the challenged actions by Freddie Mac, i.e., the termination of ABM as a seller/servicer. Cf. Rendell-Baker v. Kohn, 457 U.S. 830, 841, 102 S.Ct. 2764, 2771, 73 L.Ed.2d 418 (1982) (petitioners challenging discharge by private school had not shown decisions were compelled or even influenced by state regulation; in contrast to extensive regulation of school generally, regulators showed little interest in personnel matters). Although appellant points to the requirement of 12 U.S.C. § 1456(f)(2)(J) that Freddie Mac report to Congress and HUD on, among other matters, the race and gender of approved seller/servicers, they offer no suggestion of how this requirement might even be related to the particular termination decisions challenged here, let alone how this requirement presents a sufficiently close nexus for state action purposes. Cf. Liberty Mortgage, 822 F.Supp. at 959 ("[N]o federal agency exercises any oversight or regulatory control over the day-to-day decision making of Freddie Mac. Thus, there is not a sufficiently close nexus between Freddie Mac's decision to terminate Liberty and the federal government to treat the termination as government action.").
 
 
 24
 2. Exclusively Governmental Nature of Function
 
 
 25
 The second factor to be considered is whether "the challenged entity performs functions that have been " 'traditionally the exclusive prerogative' " of the Federal Government", San Francisco Arts & Athletics, 483 U.S. at 544, 107 S.Ct. at 2985 (quoting Rendell-Baker, 457 U.S. at 842, 102 S.Ct. at 2772 (quoting Jackson, 419 U.S. at 353, 95 S.Ct. at 455)). While Freddie Mac's objective of increasing the affordability of housing is clearly governmental, performance of activities that serve a national interest does not in itself constitute federal action. Id. at 545, 107 S.Ct. at 2985. The powers exercised by Freddie Mac in participating in the secondary market for mortgages and improving access to home loans for low- and moderate-income families hardly qualify as powers "traditionally associated with sovereignty, such as eminent domain". Jackson, 419 U.S. at 353, 95 S.Ct. at 454. Cf. Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 158, 98 S.Ct. 1729, 1734, 56 L.Ed.2d 185 (1978) ("While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State' ".). Indeed, Freddie Mac's functions would not even seem to rise to the level of functions such as "education, fire and police protection, and tax collection", functions Flagg Bros. expressly declined to decide were sufficiently exclusive that a private actor's performance of such functions would constitute state action. 436 U.S. at 163-64, 98 S.Ct. at 1737-38.
 
 3. Coercion or Encouragement
 
 26
 The final element in determining federal action by a federally chartered corporation is whether, with regard to the challenged decision, the government " '... has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the [government]' ". San Francisco Arts & Athletics, 483 U.S. at 546, 107 S.Ct. at 2986 (quoting Blum v. Yaretsky, 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982)). Again, however, appellants point to no evidence suggesting that the federal government in any way coerced or encouraged Freddie Mac to terminate them as seller/servicers. The fact that the government requires Freddie Mac to report on the race and gender of its seller/servicers might be some encouragement (though perhaps not significant enough for the federal action test) for the corporation to terminate seller/servicers on the basis of one of those characteristics, but ABM made absolutely no allegations that the termination challenged here was made for racial or gender reasons. Cf. Liberty Mortgage, 822 F.Supp. at 959 ("[P]laintiff does not allege that the federal government in any way compelled Freddie Mac's action. Indeed, there is no allegation that any federal employee or official participated in, or even had any prior knowledge of, Freddie Mac's decision to terminate Liberty.").
 
 
 27
 Thus, Freddie Mac's termination of appellants does not constitute federal action subject to the requirements of the Fifth Amendment Due Process Clause. The district court's dismissal for failure to state a claim on the grounds that the termination was not government action was correct.
 
 II. State-Law Claims[7]
 A. Conversion
 
 28
 ABM argues that it had at the least a right of possession to the servicing rights in the portfolio of mortgages it serviced for Freddie Mac and that Freddie Mac's transfer of those servicing rights constituted conversion.
 
 
 29
 ABM is correct that under California law a claim of conversion will lie even if the allegedly converted property is intangible. See, e.g., A & M Records, Inc. v. Heilman, 75 Cal.App.3d 554, 142 Cal.Rptr. 390, 400 (1977), cert. denied 436 U.S. 952, 98 S.Ct. 3063, 57 L.Ed.2d 1118 (1978) (sound recordings); Lone Ranger Television, Inc. v. Program Radio Corp., 740 F.2d 718, 726 (9th Cir.1984) (applying California law) (sound recordings); Swim v. Wilson, 90 Cal. 126, 27 P. 33, 34 (1891) (corporate shares); Fiedler v. Allen, 117 Cal.App. 622, 4 P.2d 292, 293 (1931) (bonds). Under California law, however, not all intangible property is the proper subject of claims of conversion. See, e.g. Adkins v. Model Laundry Co., 92 Cal.App. 575, 268 P. 939, 942 (1928) (no conversion of laundry route); Olschewski v. Hudson, 87 Cal.App. 282, 262 P. 43, 45 (1927) (no conversion of customer list). Even if we assume, without deciding, that the mortgage servicing rights at issue here are the proper subject of a conversion claim, ABM as a matter of law cannot prove such a claim.
 
 
 30
 "The elements of a conversion cause of action [in California] are (1) plaintiffs' ownership or right to possession of the property at the time of the conversion; (2) defendants' conversion by a wrongful act or disposition of plaintiffs' property rights; and (3) damages." Baldwin v. Marina City Properties, Inc., 79 Cal.App.3d 393, 145 Cal.Rptr. 406, 416 (1978). ABM has not raised a genuine issue of material fact as to its right to possess the mortgage servicing rights at the time that Freddie Mac transferred those rights to other servicers.
 
 
 31
 ABM's status as a seller/servicer and its relationship with Freddie Mac were governed by contract. Each contract included the Sellers' and Servicers' Guide. That document provides that "[m]ortgages purchased by Freddie Mac must be serviced by a Servicer". Guide, § 6201(a). Under the contracts then, ABM had no right to service any mortgage owned by Freddie Mac unless it was a "Servicer". The Guide defines a "Servicer" as "a Seller/Servicer acting in its capacity as a servicer of mortgages for Freddie Mac", and defines a "Seller/Servicer" as "an institution approved to sell mortgages to, and to service mortgages purchased by, Freddie Mac". Guide, § 0230. Thus, unless an entity is approved by Freddie Mac as a Seller/Servicer, it has no right to service mortgages purchased by Freddie Mac.
 
 
 32
 While Freddie Mac had approved ABM as a seller/servicer, it terminated ABM's eligibility to sell and service mortgages, pursuant to Guide §§ 0402, 0403, and 6309, by oral notice, effective immediately, followed by written confirmation. Upon termination, ABM ceased to be a "Seller/Servicer" and by the terms of the contract had no right to service mortgages owned by Freddie Mac. Therefore, ABM had no remaining possessory interest in the servicing rights to its mortgage portfolio and cannot establish the first element of a conversion claim.
 
 
 33
 ABM also argues that summary judgment on its claim of conversion was improper because the contractual provisions that the district court found entitled Freddie Mac to terminate its eligibility as a seller/servicer were unconscionable terms of contracts of adhesion. California law defines a contract of adhesion as " '... a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it' ". Graham v. Scissor-Tail, Inc., 28 Cal.3d 807, 171 Cal.Rptr. 604, 610, 623 P.2d 165, 171 (1981) (quoting Neal v. State Farm Ins. Cos., 188 Cal.App.2d 690, 10 Cal.Rptr. 781, 784 (1961)). The contracts may well meet the California definition of adhesion. The fact that ABM negotiated certain waivers for each of its Master Commitment Contracts with Freddie Mac does not prevent other provisions of the contract from being classified as adhesive. Graham, 171 Cal.Rptr. at 611, 623 P.2d at 172 ("The terms here asserted to be subject to negotiation, assuming that they were in fact so, were of relatively minor significance in comparison to those imposed by [the other party] ... In these circumstances we cannot conclude that the presence of other assertedly negotiable terms acted to remove the taint of adhesion.").
 
 
 34
 Even if we assume that the contracts are adhesive, ABM cannot show that the termination provisions should not be enforced. A contract of adhesion is fully enforceable in California unless in whole or in part it "does not fall within the reasonable expectations of the weaker or 'adhering' party" or is "unduly oppressive or 'unconscionable' ". Id. 171 Cal.Rptr. at 612, 623 P.2d at 172-73. ABM cannot show that the termination provisions were not within its reasonable expectations. Like the plaintiff in Graham, ABM had, over the course of its relationship with Freddie Mac, signed a number of Master Commitment Contracts governed by substantially the same Guide provisions and clearly had an "awareness" (though not as "abiding" as that in Graham ) of those provisions. Graham, 171 Cal.Rptr. at 612, 623 P.2d at 173.
 
 
 35
 ABM bears the burden of raising a triable issue of fact as to unconscionability, although the procedural posture of the issue in this case is somewhat unusual. Westlye v. Look Sports, Inc., 17 Cal.App.4th 1715, 22 Cal.Rptr.2d 781, 792 (1993) (unconscionability is a question of law, but its resolution turns on factual circumstances of case). The California cases usually have involved a defense to the enforcement of a contract. In this case, ABM sued Freddie Mac for conversion, Freddie Mac defended by arguing that under the contracts ABM retained no rights in the mortgage portfolios once its eligibility was terminated, and ABM then defended against the defense by asserting that the contract was adhesive and unconscionable. This was the precise posture in which the issues arose in Westlye, in which the plaintiff sued defendants in tort for injuries suffered in a skiing accident, defendants defended against the claim by introducing the equipment rental agreement that plaintiff had signed (in which plaintiff released the lessor from liability and assumed the risk), and the plaintiff raised the adhesion and unconscionability of the contract as "a defense to the defense". 22 Cal.Rptr.2d at 793. The court there held that a plaintiff raising such a "defense to the defense" had the burden to raise a triable issue of material fact to make unconscionability an issue.[8] Id. 22 Cal.Rptr. at 795.
 
 
 36
 ABM has not made a showing of unconscionability sufficient to survive summary judgment. One factor in the unconscionability determination is "the absence of meaningful choice", Perdue v. Crocker Nat'l Bank, 38 Cal.3d 913, 216 Cal.Rptr. 345, 355, 702 P.2d 503, 513 (1985), appeal dismissed, 475 U.S. 1001, 106 S.Ct. 1170, 89 L.Ed.2d 290 (1986). At least one California court has held that "any claim of 'oppression' may be defeated if the complaining party had reasonably available alternative sources of supply from which to obtain the desired goods or services free of the terms claimed to be unconscionable". Dean Witter Reynolds, Inc. v. Superior Court, 211 Cal.App.3d 758, 259 Cal.Rptr. 789, 795 (1989); see also Kurashige v. Indian Dunes, Inc., 200 Cal.App.3d 606, 246 Cal.Rptr. 310, 314 (1988). In the hearing on Freddie Mac's motion for summary judgment, the court asked counsel for ABM if Freddie Mac was "the only place that they can sell these mortgages". The attorney responded that "[t]o a large extent that is the case" and that "there is no private entity to which it can in turn sell these mortgages". Freddie Mac's counsel asserted that ABM was in fact selling mortgages to Fannie Mae and Ryland Acceptance Corporation, and that other secondary market investors existed. Although neither party appears to have provided evidentiary support for its assertions, ABM's complaint admits that it "was approved to originate, service, and sell loans" by Fannie Mae, the Veteran's Administration (VA), and the Federal Housing Authority (FHA). ABM admits that Fannie Mae buys mortgages, but argues that Freddie Mac "offers a pricing advantage over Fannie Mae" such that a company that sold only to Fannie Mae could not compete in the marketplace. The fact that a buyer or seller is the only source not of a particular product or service but of a particular price advantage is an insufficient argument for unconscionability where alternative sources for the product or service exist.
 
 
 37
 The real question is whether Fannie Mae and all other investors in the secondary mortgage market impose the same termination provisions as those in Freddie Mac's contracts with its seller/servicers, since the issue is whether other entities existed that would buy mortgages and mortgage servicing from ABM "free of the terms claimed to be unconscionable". Dean Witter Reynolds, 259 Cal.Rptr. at 795. No evidence was presented on that question. Since ABM asserted unconscionability as a defense to Freddie Mac's contract defense to the conversion claim, it was incumbent upon ABM to make some showing that a genuine issue of fact existed as to the question of alternative sources.
 
 
 38
 ABM also appears to press on appeal its allegations of conversion of approximately $500,000 that was commingled with Freddie Mac funds in custodial accounts. Appeal of the merits of this claim is improper since it was dismissed with prejudice by stipulation of the parties as part of an agreement dismissing all claims remaining in the complaint and cross-complaint after summary judgment and offsetting $500,000 against the $1.9 million judgment in favor of Freddie Mac.
 
 B. Relief From Forfeiture
 
 39
 California Civil Code § 3275 provides for relief, under certain circumstances, where a party's failure to comply with the provisions of a contract results in a forfeiture.[9] The party in default must plead and prove facts entitling it to relief under the section. Barkis v. Scott, 34 Cal.2d 116, 208 P.2d 367, 370 (1949).
 
 
 40
 ABM argues that the district court's grant of summary judgment on its claims for relief from forfeiture was improper because genuine issues of fact existed as to whether ABM was guilty of "grossly negligent, willful, or fraudulent breach of duty" so as to preclude the application of § 3275 and whether appellees were unjustly enriched, which under California law might allow the court to order restitution to appellants even if § 3275 did not apply.
 
 
 41
 The district court granted summary judgment on the grounds that § 3275, which it found was intended "to relieve a defaulting purchaser from the odious burden of losing previous installment payments by virtue of a default on a single, subsequent payment", did not apply to this situation because Freddie Mac's termination of ABM did not deprive ABM of the benefit of any previous payments. It also held that under California law, § 3275 requires "some measurable enrichment of defendant from which the damage suffered by him is to be deducted", Lines v. Marin Mun. Water Dist., 228 Cal.App.2d 155, 39 Cal.Rptr. 294, 297 (1964), and that Freddie Mac was not enriched in any way by transferring ABM's mortgage portfolios to other seller/servicers.
 
 
 42
 Even if we assume that § 3275 applies, Freddie Mac is entitled to summary judgment on the ground that § 3275 requires that a party seeking relief must make full compensation for its failure to comply with the provisions of the contract. In its motion for summary judgment, Freddie Mac provided deposition testimony by Richard H. Johnson, ABM's president and CEO, that ABM had never made any offer of payment in response to Freddie Mac's demand for $1.2 million owed it because of "misapplication of payments, ... account shortages, and payments received that ha[d] not been forwarded to [Freddie Mac's] interim servicer". In opposing Freddie Mac's motion for summary judgment on this point, ABM offered no evidence to controvert this point. As a result, even if § 3275 applies to this situation, ABM has failed to demonstrate its right to relief under that section.
 
 
 43
 ABM argues that it has a triable claim for relief from forfeiture against Countrywide Credit. This appears to be a new argument on appeal, as the company's original claim for relief from forfeiture never mentioned Countrywide. Indeed, the district court's conclusions of law in support of its summary judgment treat the conversion claim as the only one involving Countrywide. Even if the original complaint were construed so liberally as to include claims for relief from forfeiture against Countrywide, such a claim would fail as a matter of law. Section 3275 addresses forfeiture resulting from failure to comply with the provisions of an "obligation" and only applies to the parties to the obligation. There is no evidence whatsoever that any contract existed between ABM and Countrywide.
 
 CONCLUSION
 
 44
 Because Freddie Mac is not a federal entity and its termination of ABM's status as a seller/servicer was not federal action, the dismissal of appellant's due process claims is affirmed. Because appellant has created no genuine triable issue of material fact as to its conversion or relief from forfeiture claims, summary judgment on those claims is also affirmed.
 
 
 
 [1]
 As modified by the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, Pub.L. 102-550, § 1382(a), 106 Stat. 4002 (1992), those provisions of FIRREA state:
 "It is the purpose of the Federal Home Loan Mortgage Corporation--
 "(1) to provide stability in the secondary market for residential mortgages;
 "(2) to respond appropriately to the private capital market;
 "(3) to provide ongoing assistance to the secondary market for residential mortgages (including activities relating to mortgages on housing for low- and moderate-income families involving a reasonable economic return that may be less than the return earned on other activities) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing; and
 "(4) to promote access to mortgage credit throughout the Nation (including central cities, rural areas, and underserved areas) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing."
 12 U.S.C. § 1451 note.
 Appellants argue that the statute's grant to Freddie Mac of the "power ... to make and enforce such bylaws, rules, and regulations as may be necessary or appropriate to carry out the purposes or provisions of this chapter", 12 U.S.C. § 1452(c)(3) makes Freddie Mac a government entity because making and enforcing regulations to carry out provisions of the U.S. Code is a uniquely governmental prerogative. This grant, however, appears to be nothing more than the standard language authorizing a corporation to carry out the purposes for which it was incorporated. Lebron therefore indicates that the relevant issue is not merely the fact that those purposes appear in the Code but rather whether those purposes are in fact federal governmental objectives.
 
 
 [2]
 "The Congress finds that--
 "(1) the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation ... and the Federal Home Loan Banks ... have important public missions that are reflected in the statutes and charter Acts establishing [them];
 "(2) ... the continued ability of the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation to accomplish their public missions is important to providing housing in the United States and the health of the Nation's economy ...
 "(7) the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation have an affirmative obligation to facilitate the financing of affordable housing for low- and moderate-income families ..."
 12 U.S.C. § 4501.
 
 
 [3]
 The current governance structure was created by FIRREA, which dramatically overhauled Freddie Mac. Before FIRREA, Freddie Mac was governed by a three-member board of directors, composed of the members of the Federal Home Loan Bank Board. Pub.L. 91-351, § 303, 84 Stat. 452 (1970). Freddie Mac's stock was to be issued only to Federal home loan banks. Id. at § 304
 
 
 [4]
 In 1994, as part of a comprehensive revision of the portions of the U.S. Code relating to transportation, the statute governing Amtrak was revised and reenacted as part of Title 49. See 49 U.S.C. § 24301 et seq. The provisions that now appear at 49 U.S.C. § 24302 correspond to the pre-revision 45 U.S.C. § 543, the section quoted from and cited to in Lebron
 
 
 [5]
 The Supreme Court itself noted in Lebron that "[i]t is fair to say that 'our cases deciding when private action might be deemed that of the state have not been a model of consistency' ". --- U.S. at ----, 115 S.Ct. at 964 (quoting Edmonson v. Leesville Concrete Co., 500 U.S. 614, 632, 111 S.Ct. 2077, 2089, 114 L.Ed.2d 660 (1991) (O'Connor, J., dissenting))
 In recent cases other than San Francisco Arts & Athletics, the Court has suggested a somewhat different, two-step approach to determining when "conduct allegedly causing the deprivation of a federal right [can] be fairly attributable" to a state government:
 First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.... Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor.
 Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S.Ct. 2744, 2753-54, 73 L.Ed.2d 482 (1982) (considering whether respondent's prejudgment attachment of petitioner's property under state ex parte proceeding constituted state action). See also Georgia v. McCollum, 505 U.S. 42, 50-55, 112 S.Ct. 2348, 2354-57, 120 L.Ed.2d 33 (1992) (finding a state criminal defendant's exercise of peremptory challenges constitutes state action for equal protection purposes); Edmonson v. Leesville Concrete Co., 500 U.S. 614, 619-28, 111 S.Ct. 2077, 2082-87, 114 L.Ed.2d 660 (1991) (finding a federal civil litigant's exercise of peremptory challenges constitutes state action for equal protection purposes).
 The discussion of federal action in San Francisco Arts & Athletics, which involved a fact pattern much more similar to that involved here than any of these "two-step" cases, made no mention of the framework set forth five years earlier in Lugar.
 
 
 [6]
 These include:
 
 
 *
 limits on whom the President can appoint to the corporation's board, 12 U.S.C. § 1452(a)(2)(A);
 
 
 *
 requirements that Freddie Mac submit reports to Congress and to the Department of Housing and Urban Development (HUD), 12 U.S.C. §§ 1452(h)(1), 1456(c), 1456(f);
 
 
 *
 Cabinet oversight of provisions of its executive employment agreements, 12 U.S.C. § 1452(h)(2);
 
 
 *
 limits on the original principal obligations of the mortgages it purchases, 12 U.S.C. § 1454(a)(2);
 
 
 *
 requirements for Cabinet approval of unsecured borrowing or debt obligations, 12 U.S.C. §§ 1455(j)(1), 1455(k)(1);
 
 
 *
 audits by the Comptroller General, 12 U.S.C. § 1456(b)(1);
 
 
 *
 a requirement to appoint an Affordable Housing Advisory Council, 12 U.S.C. § 1456(g);
 
 
 *
 mandated goals of the dollar amount and proportion of mortgages to be purchased by Freddie Mac that are for properties affordable to low- and moderate-income buyers, 12 U.S.C. § 4563(d)(2); and
 
 
 *
 mandated goals of the proportion of mortgages to be purchased by Freddie Mac that are for properties in central cities, 12 U.S.C. § 4564(d)
 
 
 [7]
 All parties have assumed, without discussion, that California law applies to the remaining claims
 
 
 [8]
 Since the Westlye court had earlier held unconscionability to be a question of law to be determined based on "the factual circumstances of the case", this holding appears to mean that a plaintiff must create a genuine issue of material fact as to circumstances from which a court could find the contract adhesive and the challenged provision unconscionable
 
 
 [9]
 The full text of the section reads: "Whenever, by the terms of an obligation, a party thereto incurs a forfeiture, or a loss in the nature of a forfeiture, by reason of his failure to comply with its provisions, he may be relieved therefrom, upon making full compensation to the other party, except in case of a grossly negligent, willful, or fraudulent breach of duty."